Frances Broaddus CRUTCHFIELD and Henry Ruffin Broaddus, Plaintiffs

v.

UNITED STATES ARMY CORPS OF ENGINEERS and County of Hanover, Virginia, Defendants.

No. CIV.A. 3:02CV253.

United States District Court, E.D. Virginia. Richmond Division.

Aug. 7, 2002.

Williams B. Ellis, Benjamin A. Thorp, III, Ellis & Thorp, Richmond, VA, for Plaintiffs.

Gregory S. Williams, U.S. Dept. of Justice, Environmental Defense, Environment and Nat. Resources Div., Washington, DC, Katherine D. Will, U.S. Army Corps of Engineers, Norfolk Div., Norfolk, VA, M. Hannah Lauck, U.S. Attorney's Office, Richmond, VA, for Corps.

Sterling E. Rives, III, Yvonne S. Wellford, Hanover County Attorney's Office, Hanover, VA, William G. Broaddus, McGureWoods LLP, Richmond, VA, for Hanover Co.

## MEMORANDUM OPINION

PAYNE, District Judge.

The County of Hanover, Virginia (the "County") received from the United

States Army Corps of Engineers (the "Corps") authorization to build a project, the purpose of which is to collect sewage, treat it, and then discharge the treated sewage into the Pamunkey River. As designed, the point of discharge (or "outfall") would be located on property that Frances Broaddus Crutchfield and Henry Ruffin Broaddus (the "Plaintiffs") own, and the discharge would be dispersed into the Pamunkey River by a diffuser that would be located in the Pamunkey River where the river abuts the Plaintiffs' property.

The Virginia Department of Environmental Quality (the "DEQ") has classified the Pamunkey River as "impaired" because the level of fecal bacteria extant therein exceeds that which is allowable under applicable water quality standards.[1] The Pamunkey River also suffers from shortage of dissolved oxygen and, for that reason, the DEQ has listed it as "threatened due to natural conditions." *See* Administrative Record, at 1806–08.

In a previous action, the Court invalidated the Corps' decision to verify that the County could construct a slightly different version of the project pursuant to several so-called Nationwide Permits ("NWPs"). The matter was remanded to the Corps, which, by a Memorandum for the Record ("MFR") dated April 4, 2002 (the "April 4 MFR"), decided that the County could proceed with a modified version of its wastewater treatment project under a different set of NWPs. In this action, the Plaintiffs challenge that second permitting decision.

For a complete understanding of the previous litigation, it is advisable to refer to the Memorandum Opinions issued in *Crutchfield v. United States Army Corps of Engineers,* Civil Action No. 3:00cv525, on August 14, 2001,[2] November 2, 2001,[3] and December 12, 2001,[4] and to the Memorandum Order issued May 22, 2002 (collectively referred to as *"Crutchfield* I"). Those decisions provide a comprehensive review of the first dispute, resolution of which preceded, and forms the background of, this action. In the interests of brevity and completeness, the opinions in *Crutchfield* I are incorporated here, however, a summary review of the prior litigation is set forth in Section I.A.

Like *Crutchfield* I, this action was filed pursuant to the judicial review provisions of the Administrative Procedure Act, 5 U.S.C. § 551, *et seq.* (the "APA"). The Complaint alleges that, in addition to violating the APA, the decision-making process through which the Corps verified the County's use of four NWPs as the authority under which to construct its revised sewage treatment project contravened the Clean Water Act ("CWA"), 33 U.S.C. §§ 1251 *et seq.;* the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321 *et seq.;* and the National Historic Preservation Act ("NHPA"), 16 U.S.C. §§ 470 *et seq.* The Plaintiffs contend that, for a second time, the Corps' actions with respect to the County's project were arbitrary, capricious, and not in accordance with law.[5] The parties have submitted

---

**1.** *See generally,* Rex Springston, *Dirty Water Report Issued, Richmond Times Dispatch,* July 15, 2002, at B1–B2; Water Quality Assessment and Impaired Waters Reports, Virginia Department of Environmental Quality, July 2002, *available at* http://www.deq.state.va.us/water/303d/factsheets/yorkfs.pdf.

**2.** Reported at 154 F.Supp.2d 878 (E.D.Va. 2001).

**3.** Reported at 192 F.Supp.2d 444 (E.D.Va. 2001).

**4.** Reported at 175 F.Supp.2d 835 (E.D.Va. 2001).

**5.** The Plaintiffs sought preliminary injunctive relief to prohibit the County from undertaking

briefs in support of their respective positions on the merits of the Plaintiffs' challenge, and, on July 10, 2002, oral argument was heard. For the reasons set forth below, the Corps' decision to verify the NWPs, as articulated in the April 4 MFR, is set aside as arbitrary, capricious, and not in accordance with law.

## I. STATEMENT OF FACTS

### A. *Crutchfield* I

As stated above, the nature and evolution of this dispute can be appreciated fully only in perspective of the decisions in *Crutchfield* I, however, for present purposes, an abbreviated review of that case must suffice. Under the circumstances outlined exhaustively in the decisions issued in *Crutchfield* I, the County planned, and began construction of, a wastewater treatment project, several aspects of which implicated federal environmental laws and regulations, and, as such, required authorization by the Corps. That project, as it originally was conceived, involved construction of a wastewater treatment plant (the "WWTP"), an interceptor pipeline to carry untreated wastewater to the WWTP for treatment (which the parties referred to as the "TC Interceptor"), a discharge forcemain, and an outfall/diffuser structure. *See generally Crutchfield*, 154 F.Supp.2d at 881–86, 175 F.Supp.2d at 838–40, 192 F.Supp.2d at 447–51. Pursuant to the CWA and its implementing regulations, the Corps was called upon to decide what type of permits, if any, could issue to authorize the County to undertake

construction on its wastewater treatment project pending review of the merits of their claims, however, by a May 17, 2002 oral ruling from the bench, such relief was denied. The decision denying the Plaintiffs' motion for preliminary injunctive relief also was memorialized by Order entered May 21, 2002.

certain activities (*i.e.*, dredging, filling, and construction) involving wetlands upon which components of that project were intended to be built.[6] On June 7, 2000, the Corps issued a Memorandum for the Record verifying that the County was authorized to proceed with construction of the WWTP, forcemain, and outfall pursuant to Nationwide Permits ("NWPs") because those three components of the project would cause only minimal impacts to wetlands. However, the Corps also decided that the TC Interceptor needed to be assessed under the more stringent regulations applicable to individual permits because the impact on wetlands of that component would be more than minimal.

At the risk of oversimplification, there are two basic processes through which the Corps may confer its regulatory approval upon projects that affect wetlands which are subject to its jurisdiction. One is the general permit procedure, of which verification of an NWP authorization is one kind. The other is the issuance of an individual permit.

Projects that are permitted to proceed under NWPs undergo no significant environmental review under the CWA; that is because such a project qualifies for NWP status only upon a preliminary determination that it will have "minimal impacts" upon wetlands. In contrast, projects that must proceed pursuant to the individual permit process undergo a rigorous environmental review. Clearly, it is significantly advantageous for a permit applicant to be allowed to proceed under an NWP

**6.** The Corps' permitting decisions involved: (1) making certain evaluations under the CWA and other environmental laws; and (2) deciding whether to require certain kinds of permits which, in some circumstances, would give rise to an obligation to conduct additional evaluations pursuant to NEPA and NHPA. *See generally Crutchfield*, 154 F.Supp.2d at 893–905, 175 F.Supp.2d at 838–39.

and, thereby, avoid the expense and delay that attends the more thorough environmental scrutiny that is inherent in the individual permit process. Thus, the determination whether a project poses a greater than "minimal impact" on wetlands is of critical importance. And, as shown in *Crutchfield* I, the definition of the project is a fundamental aspect of the determination that a project will, or will not, engender only "minimal impacts." [7]

The gravamen of the Plaintiffs' claims in *Crutchfield* I was that, in verifying that the County could proceed with construction of the WWTP, the forcemain, and the outfall, the Corps had failed to take into account the environmental impacts of the TC Interceptor, for which the County separately had sought authorization in the form of an individual permit. By authorizing the County to proceed in that manner, the Plaintiffs argued, the Corps had allowed the County improperly to "segment" the TC Interceptor from the other compo-

nents of the project, thereby evading the full measure of regulatory scrutiny that the environmental laws require. *See id.* at 881. The record reflected that the Plaintiffs were correct; and, therefore, the verifications that the Corps had given were set aside as arbitrary, capricious, and not in accordance with law.[8] *See Crutchfield,* 154 F.Supp.2d at 904–06. The matter was remanded to the Corps so that it could evaluate the project as a whole and, in perspective of that evaluation, satisfy the applicable requirements of the CWA, NEPA and NHPA.

In perspective of that judgment, and by letter dated September 25, 2001, the Corps informed the County that it had "determined that all four components of the County's expansion of its sewage treatment system should be consolidated into a single [Joint Permit Application] for review and processing of an individual Department of the Army permit." Accordingly, the Corps asked the County to

---

7. For a more thorough explanation of the differences between NWPs and individual permits, *see Crutchfield,* 154 F.Supp.2d at 893–94. As stated there:

> Under the CWA, the Corps has established two mechanisms to authorize the conduct of activities that affect waters of the United States: individual permits and general permits. *See* 33 C.F.R. § 325.5. The Corps issues individual permits after reviewing applications. "Individual permit" means "a DA authorization that is issued following a case-by-case evaluation of a specific structure or work in accordance with the procedures of this regulation and 33 CFR part 325, and a determination that the proposed structure or work is in the public interest pursuant to 33 CFR part 320." 33 C.F.R. § 322.2(e). The Corps also may issue general permits "that authorize a category or categories of activities in specific geographical regions or nationwide." 33 C.F.R. § 320.1(c); *see also* 33 C.F.R. § 322.2(f) .... Nationwide permits (NWPs) ... are nationwide general permits that "are designed to regulate with little, if any,

delay or paperwork certain activities having minimal impacts." 33 C.F.R. § 330.1(b) .... NWPs are issued to allow conduct of a class of activities that the Corps has studied that, either because of the nature of the activity or the small reach of its impact, have sufficiently minimal impact as to justify bypassing the stricter regulatory review given applications for individual permits. In contrast, standard individual permits require compliance with "public interest review procedures, including public notice and receipt of comments." 33 C.F.R. § 325.5(b)(1). This public interest review involves an evaluation of "the practicability of using reasonable alternative locations and methods to accomplish the objective of the proposed structure or work." 33 C.F.R. § 320.4(a)(2)(ii).

*Crutchfield,* 154 F.Supp.2d at 893–94.

8. In *Crutchfield* I, just as they do in this action, the Plaintiffs alleged that the defendants' decision to verify NWPs, and the process through which they reached that decision, violated the APA, CWA, NEPA, and NHPA.

"modify [its] current [individual permit application for the TC Interceptor], along with the necessary appendices, drawings and supporting information, to include the WWTP, forcemain and outfall." *See Crutchfield,* 192 F.Supp.2d at 451.

The Corps informed the Court of that development in a pleading filed October 2, 2001, one day before a scheduled hearing on the Plaintiffs' motion for permanent injunctive relief. The Corps represented that it would "address all components of the project in a single permitting action and [that it would] do so in the context of an application for an individual permit rather than a request for an NWP authorization." In that same pleading, however, the Corps also expressed that it did "not understand the Court to have required an individual permit application for any of the project components[,]" and, instead, had "made its decision to require an individual permit application for the [I]nterceptor, WWTP, forcemain, and outfall on a number of factors, including a reevaluation of the permitting procedures that would be most appropriate in light of the Court's decision." [9]

By the time that decision was issued, the County virtually had completed construction of the forcemain and had made substantial progress in constructing the WWTP. However, construction of the outfall/diffuser and, of course, the TC Interceptor had not begun. The County desired to continue work on the WWTP, but the Plaintiffs objected. Thus, the parties argued, and adduced evidence respecting, whether injunctive relief was necessary pending completion of the tasks with which the August 14 Opinion charged the Corps on remand. In perspective of both the facts of record and the relevant legal principles, the Court determined that injunctive relief was appropriate. *See id.* at 466–67. Therefore, on November 2, 2001, the County was enjoined from undertaking further construction on the wastewater treatment project until such time as the Corps, on remand, properly and fully had discharged its statutory responsibilities. *See id.*

On November 16, 2001, and in accordance with the Corps' letter of September 25, the County submitted to the Corps a revised Joint Permit Application (the "November 16 JPA") in which it sought authorization to construct the WWTP, forcemain, and outfall/diffuser (as those components of the project originally had been designed), as well as a new component referred to as the Lee Davis Pump Station and Forcemain (the "Lee Davis Alternative"). A.R., at 1468. The County explained that the Lee Davis Alternative was intended to replace the TC Interceptor as the initial means through which raw sewage would be conveyed to the WWTP. Whereas the TC Interceptor had been expected permanently to impact 3.84 acres of wetlands, which would have disqualified it for verification under any NWP, the Lee Davis Alternative was expected to impact only 30 square feet of wetlands. The County also represented that it had abandoned any plans to construct the TC Interceptor in the foreseeable future, and it formally withdrew its original permit application for that component. *See generally Crutchfield,* 175 F.Supp.2d at 840–42.

Having done so, the County filed a motion to stay the order of injunction entered on November 2, which the Court converted into a motion seeking dissolution of that

**9.** October 2, 2001, Pre–Hearing Brief by United States Corps of Engineers, at 2–3, *filed in*

*Crutchfield v. United States Army Corps of Engineers, et al.,* Civil Action No. 3:00cv525.

injunction.[10] That motion was premised upon what the County contended was a significant change in circumstances brought about by its submission of the revised JPA—*i.e.,* the fact that construction of the revised project (as described in that application), would cause substantially less impact to wetlands than previously had been anticipated.[11] For the reasons set forth in the Memorandum Opinion issued December 12, 2001, that motion was denied. *See Crutchfield,* 175 F.Supp.2d at 849.

Accordingly, the Corps proceeded with its consideration of the revised JPA with the November 2 injunction still firmly in effect—that is to say, the County could not, and did not, undertake any construction activity on the project while the Corps reviewed the new JPA. Approximately four months later, the Corps issued the April 4 MFR in which, rather than declaring whether the County's application satisfied the criteria for approval of an individual permit, it again verified that the County could proceed with construction of the several components of the revised project under the authority of NWPs (albeit different NWPs than were at issue in *Crutchfield* I). On that same day, the Corps notified the Court of its decision.

## B. The Plaintiffs' Challenge in this Case

Almost immediately after the April 4 MFR was issued, the County sought dissolution of the injunction that had been in place since November 2, 2001. The Plaintiffs filed both a brief in opposition to the County's motion to dissolve that injunction and this, entirely new, action. As noted above, the Plaintiffs also moved for preliminary injunctive relief which, if granted, would have had the practical effect of prohibiting the County from undertaking the construction activities that the newly verified NWPs otherwise authorized it to undertake.

Recognizing that there were "a significant number of common factual and legal issues presented by" the County's motion to vacate the November 2 permanent injunction and the Plaintiffs' motion for preliminary injunctive relief in the new action, and with an eye toward avoiding inconsistent adjudication of those common issues, those motions were set for simultaneous briefing and oral argument. On May 17, 2002, the County's motion to vacate the November 2 injunction was granted because its purpose had been accomplished.[12] The Plaintiffs' motion for a preliminary injunction was denied because they had failed to demonstrate that they would suf-

---

**10.** *See Crutchfield,* 175 F.Supp.2d at 840–41. To be precise, the County actually filed its motion to stay on November 9, 2001, a few days before it submitted its revised JPA, however, on November 16, it filed a revised motion to stay, which it based on its submission of the November 16 JPA. *Id.*

**11.** The County also proffered the Corps' representation that it would assign entirely new staff members to consider, and to make ultimate permitting decisions with respect to, the County's revised JPA as an additional "change in circumstances" warranting dissolution of the injunction. *See Crutchfield,* 175 F.Supp.2d at 840–43; 847–49.

**12.** Because the County had appealed several of the judgments in *Crutchfield* I, the act of vacating the November 2 permanent injunction properly could not be effected until the United States Court of Appeals for the Fourth Circuit remanded the case, thereby reinstating this Court's jurisdiction over the parties for the limited purpose of dissolving that injunction. That all was accomplished pursuant to the Fourth Circuit's teachings, *see Fobian v. Storage Technology Corp.,* 164 F.3d 887, 891 (4th Cir.1999), and, by Order entered June 4, 2002, the November 2 permanent injunction formally was vacated.

fer irreparable injury before this action could be decided on its merits.

The action was set for hearing on the merits of the Plaintiffs' challenge, which calls into question both the process by which the Corps reached its decision to verify NWPs for the County's revised project and the legality of the decision. It is necessary, therefore, to discuss in some detail the project for which the County sought the Corps' authorization, the process through which the Corps reviewed that project, and the findings that the Corps made in its April 4 MFR.

### 1. The Purpose Of The Project

The record here, as in *Crutchfield* I, demonstrates that "[t]he construction and operation of the wastewater treatment project are integral to the County's ability to meet its goals under its 'Comprehensive Plan,' the purpose of which is to help the County manage population growth and expansion in an orderly manner." *Crutchfield*, 192 F.Supp.2d at 447.[13] The County currently satisfies its need for wastewater treatment by using two of its own waste-water treatment facilities, which are located in the northern part of the County's growth area (referred to as the "Suburban Service Area" or "SSA") and by sending sewage from the southern portion of the SSA to Henrico County ("Henrico") for processing. The latter method of sewage treatment is accomplished pursuant to a contractual arrangement between the County and Henrico that allows the County to treat up to 5.4 million gallons per day ("mgd") at Henrico's facilities. *See id.* at 448, n. 2. Administrative Record, at 426 (hereinafter cited as "A.R., at _____.").

It is undisputed that the principal benefit that the County expects to derive from its operation of the wastewater treatment project that is at issue here is the diversion from Henrico, to its own treatment facility (the WWTP), of a substantial amount of wastewater.[14] Such "off-loading" of sewage, as the parties have referred to it, would allow the County to avoid (at least temporarily) what it perceives as an imminent threat of exceeding the 5.4 mgd limit of its contract with Henrico.[15] Specifically, the County predicts

---

**13.** Pursuant to the Comprehensive Plan, growth and the public resources necessary to sustain that growth are systematically directed into the "Suburban Service Area" in order to preserve the rural character of the remainder of the County.

**14.** As stated in a document entitled "Hanover County Wastewater Alternatives Study Prepared for the United States Corps of Engineers", which is part of the administrative record in this case, the County's project "has two components meeting two distinct needs of the County." These two needs are (1) "to provide additional wastewater treatment capacity for the critical short term and long term needs of the County[ ]"; and (2) "to be able to utilize this additional capacity through appropriate conveyance systems." A.R., at 429.

**15.** The County measures the amount of wastewater being diverted to Henrico County under the contract by calculating a 90–day rolling average. For at least one three month period in 1998, the County diverted approximately 4.5 mgd (as measured by the peak rolling average experienced during that time period) pursuant to its contract with Henrico. This 4.5 mgd figure is the highest peak rolling average that the County has experienced under the contract. In 1999, this figure decreased to approximately 3.62 mgd. In 2000, the peak rolling average increased from the 1999 figure and, as of the December 4, 2001 hearing respecting the County's motion to dissolve the November 2 injunction, the most recent peak rolling average had been approximately 3.88 mgd (measured in the spring of 2000). Fluctuations in the amount of capacity used under the contract with Henrico depend, in part, on weather patterns. *Crutchfield*, 192 F.Supp.2d at 448, n. 2. Accordingly, the County attributes the decrease in the 90–day peak rolling average between 1998 and 2000 to the extended drought experienced throughout the mid-Atlantic region.

that, absent the improvements that it intends to build, and in perspective of the approximately 4% growth per year that is anticipated within the SSA, it would need to divert approximately 5.71 mgd to Henrico as of the year 2003. A.R., at 1411. That amount, of course, would exceed the County's contractual limitation. Thereafter, in 2004, 2005 and 2006, the County predicts that it would need to divert 6.22 mgd, 6.72 mgd, and 7.3 mgd, respectively, to Henrico. *Id.* That magnitude of off-loading is untenable, however, because Henrico officials have indicated that they are not inclined to modify Henrico's contract with the County to accommodate such growth. A.R., at 1409–10. Therefore, at least in large part, the County must fend for itself, which is a major impetus driving its efforts to improve its wastewater treatment system.

The WWTP would have an initial processing capacity of 5 mgd, however, the County quickly and easily could increase that capacity to 10 mgd, and, ultimately, to 30 mgd. It makes sense, therefore, that the County's second stated objective is "to be able to utilize this additional capacity through appropriate conveyance systems (*i.e.*, sewer lines)." A.R., at 429.

### 2. The Original Project

As discussed above, the County's first attempt at obtaining federal regulatory approval for its project was frustrated upon a finding that, at the County's urging:

the Corps ... had arrived at a 'remarkably illogical conclusion' respecting whether the WWTP, the forcemain, and the outfall/diffuser had 'independent utility' from the [TC Interceptor] so that construction of those three components could proceed under authority of NWPs while the Corps considered whether to issue an individual permit for construction of the [TC Interceptor].

*Crutchfield,* 192 F.Supp.2d at 448 (*citing* 154 F.Supp.2d at 895–903; 33 C.F.R. § 330.6(d)).

The decisions in *Crutchfield* I reflect that the dispute in that case centered around the TC Interceptor, which, as noted, was intended to be the means through which the County would begin delivering untreated wastewater to the WWTP (when the WWTP first became operational). As designed, the TC Interceptor was to consist of approximately 30,000 feet of gravity sewer which was to be made of pipeline that would have varied between 36 and 48 inches in diameter and which would have been able to accommodate an average wastewater flow capacity of approximately 12 mgd. A.R., at 457–58. Initially, however, the County intended that the TC Interceptor would deliver only approximately .75 mgd to the WWTP. A.R., at 460. That conveyance was to be accomplished by connecting other sewer lines (both existing and proposed) to the TC Interceptor, through which the wastewater that those other sewer lines collected would be diverted to the TC Interceptor and, through it, to the WWTP. A.R., 1643. The TC Interceptor was designed to run parallel to the route of the Totopotomoy Creek and, primarily, to serve the portion of the SSA lying within the Totopotomoy Creek watershed. *Id.*

### 3. The Revised Project

However, after the Court invalidated the Corps' verification of NWPs for the WWTP, forcemain, and outfall components of the original project, the County decided to forego construction of the TC Interceptor, and it abandoned its application for an individual permit for that component. Instead, the County revised the project so that, at least initially, wastewater would be conveyed to the WWTP through the Lee Davis Alternative, which would consist of a

pump station (that initially would serve approximately five square miles of the SSA) and a forcemain (through which wastewater collected from that area would be pumped to the WWTP). A.R., at 451–53. In contrast to the TC Interceptor, however, the Lee Davis Alternative, and the existing and proposed sewer lines that the County envisions connecting thereto, primarily would serve a portion of the SSA lying to the south of the Totopotomoy Creek watershed area. A.R., at 1643.

The record reflects that the Lee Davis Alternative is designed initially to convey approximately .7 mgd of wastewater to the WWTP, which is only slightly less than the TC Interceptor was designed to convey.[16] A.R., at 452–54. In terms of the 90–day rolling average measurement, that .7 mgd of wastewater would result in an approximately .8 mgd decrease in the peak 90–day rolling average that the County otherwise would expect to experience under its contract with Henrico.[17] That is to say, the County anticipates that, if the Lee Davis Alternative were to become operational in 2003, the peak 90–day rolling average under its contract with Henrico would decrease by an amount equal to the .8 mgd that would be off-loaded to the WWTP. A.R., 452; 1411. The County asserts that, even absent any other additions or improvements to its wastewater treatment system, the Lee Davis Alternative would provide sufficient flows of wastewater to

allow the County not only to begin operating the WWTP but also to remain within the limit of its contract with Henrico. A.R., at 451.

There appears to be no dispute that the flow from the Lee Davis Alternative would provide enough sewage to the WWTP to allow the County to begin operating the WWTP. However, the Plaintiffs strenuously challenge the latter assertion—that, on its own, and with no additional improvements, the Lee Davis Alternative would convey enough wastewater to the WWTP to meaningfully assuage the County's self-proclaimed wastewater treatment crisis.[18] That challenge forms a core component of their arguments with respect to both the evidentiary basis upon which the Corps premised its April 4 permitting decision and the process through which it reached that decision. With that in mind, it is appropriate to consider those issues (i.e., the facts of record respecting the Corps' decisional process and the information upon which it based its ultimate decision).

### 4. The Corps' Decisional Process

The administrative record consists of some six thousand pages, most of which have nothing to do with the Plaintiffs' challenge here. Similarly, although the Corps' decisional document is forty-seven pages in length, the parts that are relevant to the

---

**16.** The initial flow capacity of the Lee Davis Alternative (i.e., the maximum amount of flow that could be conveyed thereby) is approximately 2.6 mgd, however, the County anticipates that, with relative ease, it could undertake improvements to that component that would increase its capacity to approximately 7.1 mgd. A.R., at 453–54.

**17.** The County utilizes a ratio of 1.142 to convert the "average daily flow" figure into the 90–day rolling average figure. A.R., at 452.

**18.** Hanover County, like most of Virginia, currently is experiencing the worst drought in thirty years. The County collects its storm water runoff and sewage in the same conduits and they are then treated together. With the drought there is very little storm water runoff and hence the County is not, at the moment, at risk of exceeding its contract limits with Henrico. Of course, a change in the weather would alter that circumstance. The County prudently is not basing its wastewater treatment plans on a continuation of the drought.

issues in this case consist of, at most, fifteen pages.[19]

### a. The Pre–Application Meeting, Submission Of The JPA, And The Plaintiffs' Initial Objections

Following the judicial invalidation on August 14, 2001 of the Corps' June 7, 2000 permitting decision, and in accordance with the Corps' representation that it would assign staff members to undertake the tasks with which it had been charged on remand who were different than those that had participated in the original decision, the Corps assigned primary responsibility over the County's revised JPA to Ms. Pamela K. Painter. A.R., at 2835. On November 9, 2001, which was one week after entry of the permanent injunction in *Crutchfield* I, Ms. Painter met with representatives from the County "to discuss the submission of [the County's] new application" for its wastewater treatment project. A.R., at 2654.

Ms. Painter refers to that pre-application meeting in a November 16, 2001 Memorandum for the Record (the "November 16 MFR"), in which she states that "[a]s a result of the recent litigation, *the Corps will be processing the application as an individual permit rather than as Nationwide Permits.*" *Id.* (emphasis supplied). Accordingly, she explains, "the County wanted to meet with us to discuss the process before submitting their application." *Id.* The November 16 MFR continues by describing the topics that Ms. Painter and the County representatives discussed at that meeting, among which were "alternatives to the proposed project, the individual permit review process, [and] the requirements for a complete applica-

tion[.]" *Id.* It was decided that, on December 6, 2001, the County's representatives would "make a presentation of their proposal" at a regularly scheduled Corps intra-agency meeting. *Id.*

Then, on November 16, 2001, the County formally submitted its JPA for its revised wastewater treatment project, which, as noted, sought authorization to construct the WWTP, forcemain, and outfall (all of which were components of the project as it originally had been conceived), as well as the Lee Davis Alternative (which replaced the TC Interceptor).

On the same day, Colonel David L. Hansen, who is the District Engineer for the Norfolk District of the Corps, wrote a letter to United States Senator John Warner and Representative Eric Cantor. A.R., at 2404–05. That letter was a response to a November 8, 2001 letter from Senator Warner and Representative Cantor, in which those legislators expressed their interest in, and opinions on, the Corps' review of the County's project. A.R., at 2401–03. Colonel Hansen's letter states, in relevant part, as follows:

> I have received your letter of November 8, 2001 requesting that the Norfolk District reconsider the decision to require an individual permit for Hanover County's [TC Interceptor], wastewater treatment plant, discharge forcemain and discharge outfall.
>
> *Preliminary information received at a pre-application meeting* with the County on November 9, 2001 *indicates that the wetland impacts of these activities may indeed be minimal and the project may qualify for Nationwide permits.* However, *the District's decision to assert discretionary authority* in light

---

**19.** Moreover, if the Plaintiffs are correct in their substantive positions, much of the administrative record, and about two-thirds of the April 4 MFR, are of little value because they are predicated on an irrelevant factual scenario—a project the dimensions of which are incomplete or inaccurate. *See infra.*

of the recent litigation, is based on the need to *evaluate all segments* of the project, as well as *alternatives* to the project, as a whole.

[A] *final permit decision by* the Corps could reasonabl[y] be expected within 105 days of receipt of a complete permit application from Hanover County. Hanover County's new application was hand delivered to the Norfolk District today and my staff has begun the initial review for completeness.

A.R., at 2404 (emphases supplied).

It is undisputed that an application for an individual permit must be "complete" before the Corps may issue public notice that it will review the project described in that application.[20] *See* 33 C.F.R. § 325.1(d)(9) (explaining that "[a]n application will be determined to be complete when sufficient information is received to issue a public notice."). One essential aspect of the Corps' inquiry into the "completeness" of an application is governed by 33 C.F.R. § 325.1(d)(2), which provides:

> All activities which the applicant plans to undertake which are reasonably related to the same project and for which a DA permit would be required should be included in the same permit application. District engineers should reject, as in-

complete, any permit application which fails to comply with this requirement.

Ms. Painter was charged with the task of determining whether the County's November 16 JPA was "complete" and, in this regard, her November 29, 2001 Memorandum for the Record (the "November 29 MFR") indicates that she had some initial "questions concerning the project description[.]" But, after speaking with a representative from the County on November 28, and after "going over the project drawings with him," Ms. Painter believed that she "had a thorough understanding of the project [and] enough information to prepare the public notice[ ]" therefor. A.R., at 2655.[21]

That same afternoon, however, Ms. Painter read a copy of the Plaintiffs' brief in opposition to the County's motion to dissolve the November 2 injunction in *Crutchfield* I, and, according to the same November 29 MFR, she e-mailed the same County representative (Mr. Herzog) to discuss another concern that had arisen in her mind.[22] *Id.* Specifically, Ms. Painter sought additional information respecting the Plaintiffs' contention (which they had articulated in their brief) that "the Lee Davis [Alternative] will serve a completely different area of the County than the [TC] Interceptor [and that] the [November 16]

---

**20.** The Corps' regulations respecting issuance of permits require that the general public receive notice, and have an opportunity to comment on, the Corps' decisions whether to issue permits. The nature and timing of this notice, however, varies depending upon the type of permit that is under consideration. Basically, with respect to NWPs, the regulations afford the public notice, and an opportunity to comment, before such permits are promulgated. *See* 33 C.F.R. § 330.4; 330.5. After such NWPs are issued, however, parties may undertake the types of activities authorized thereby without giving the public additional notice. *See* 33 C.F.R. § 330.4. In contrast, due to the case-by-case evaluations that the individual permitting regulations require,

the public is entitled to notice each time the Corps considers whether to issue such permits to project proponents. *See* 33 C.F.R. §§ 325.1; 325.2; 325.3.

**21.** The County's representative was Mr. Steven Herzog, who is a Utility Engineer and who has been intimately involved in planning improvements to the County's wastewater treatment system.

**22.** *See* November 27, 2001, Plaintiffs' Response to Motion of Defendant Hanover County to Dissolve Injunction, *filed in Crutchfield v. United States Army Corps of Engineers, et al.,* Civil Action No. 3:00cv525.

application submitted to the Corps does not disclose all of the County's planned activities." *Id.* Thereafter, Ms. Painter again communicated with Mr. Herzog and informed him that she "would review [his] response [to her concerns] and determine if the information was sufficient to consider the application complete." *Id.*

On December 7, 2001, counsel for the Plaintiffs sent a letter to Ms. Painter in which he reiterated his clients' position that the County's JPA was not complete; however, it is not clear on what date Ms. Painter actually received that letter. A.R., at 2156. In essence, the Plaintiffs asserted that the County "ha[d] not yet provided [the Corps] with a complete application" primarily because the application did not include "the County's plans for construction of the [TC Interceptor]." *Id.* In response to the County's suggestion that it intended for the Lee Davis Alternative to replace the TC Interceptor, the Plaintiffs noted that "these two methods of sewage collection and delivery will serve completely different areas of the County[ ]" and that "[t]he County's Comprehensive Plan and Water and Wastewater Facilities Master Plan both continue to call for service to be provided in the area that was to be served by the [TC Interceptor]." *Id.* Therefore, the Plaintiffs posited, "[i]t simply is not credible that the County has abandoned the [TC Interceptor], and in fact the County has refused to state categorically that it will not seek to build that portion of the project." A.R., at 2156–57. Counsel also pointed out that the County had not disclosed in its JPA "the plans for and the environmental effects of the other sewage collection facilities [that] it intends to construct." A.R., at 2157. Finally, counsel expressed the Plaintiffs' agree-

ment with "the Corps' decision to process this application as an individual permit[,]" because, in their view, the project, as proposed, "certainly has more than minimal environmental effects." *Id.*

### b. The Decision That The JPA Was Complete And The Issuance Of Public Notice

Almost immediately thereafter, the Corps determined that the County's JPA was "complete" (*i.e.,* that the JPA included all "reasonably related" activities that the County planned to undertake), and, on December 11, 2001, it issued public notice soliciting comments about the possible issuance of an individual permit for the project described in the JPA. A.R., at 2158; 2658–61. The Plaintiffs' counsel was informed of that decision in a letter dated December 13, 2001 from Ms. Painter. *Id.* In that letter, Ms. Painter refers to a December 6, 2001 meeting between Corps officials and representatives from the County, after which the Corps arrived at its decision that the JPA was complete. *Id.*[23]

The December 6 meeting is the subject of Ms. Painter's December 10, 2001 and December 27, 2001 Memoranda for the Record (the "December 10 and 28 MFRs"), which set forth the reasoning underlying the Corps' conclusion that the County's JPA was complete (within the meaning of 33 C.F.R. § 325.1). A.R., at 2656–57; 2714–16. As explained in those MFRs, at the December 6 meeting "[t]he County was asked to outline their future plans so that the Corps could determine if any of those activities would be reasonably related to the currently proposed project." A.R., at 2656. The following is Ms. Paint-

---

**23.** In its December 13 correspondence, the Corps informed counsel for the Plaintiffs that "[y]ou may be assured that an evaluation of [his clients' concerns] will be included in the public interest review of this project." A.R., at 2158.

er's description of the County's response to that inquiry:

The County explained that the [TC Interceptor] was originally proposed to provide initial flow to the [WWTP] from the existing pump station ... to offload wastewater being sent to Henrico County and to provide enough flow to economically operate the [WWTP]. *The Lee Davis [Alternative] will serve a portion of the Beaverdam Creek basin rather than the Totopotomoy Creek basin that would have been served by the [TC Interceptor].* However, the Lee Davis [Alternative] will *provide wastewater* flow to the [WWTP] in quantities *nearly comparable to the [TC Interceptor]. The reduction in the flow* being sent to Henrico County by the construction of the Lee Davis [Alternative] *will allow for the continued transfer to Henrico County of sewage flow collected* in the Totopotomoy Creek basin. The Lee Davis [Alternative] will therefore allow [the County] *to remain within* its contractual limits of *5.4 mgd* of treatment capacity with Henrico County *for an additional 7 to 10 years with the anticipated 3–4% growth.* The County stated that when warranted by development, additional flow from the existing Shelton Pointe pump station could be diverted via the proposed 16–inch pipe from Henrico County to the proposed [WWTP] through the proposed Lee Davis [Alternative]. Later, when warranted, the replacement of the proposed 16–inch pipe with a 20 to 24–inch pipe would provide additional capacity for the Totopotomoy service area well beyond the anticipated 10–year period. This alternative would eliminate the need for the originally proposed [TC Interceptor] in the reasonably foreseeable future.

A.R., at 2656–57; 2715 (emphases supplied).

Ms. Painter outlined the existence of the following additional considerations, which, apparently, she discussed with the County's representatives during the December 6 meeting: (1) the County represented that it anticipated "much less development", and a concomitant decrease in demand for wastewater treatment, "along the proposed [TC Interceptor] route than was expected when it was originally added to the [County's] Comprehensive Plan[;]"[24] (2) the County expected that four existing pump stations (all of which currently convey wastewater to Henrico and which "are expected to continue to do so for the next 7 to 10 years") "would continue to serve their respective areas of the [C]ounty[;]" (3) upgrades to at least two of those existing pump stations could "allow for additional flow, if needed[;]" (4) the County "also indicated [that] a new pump station for the Powhite Creek basin may be constructed as early as 2007 to pump flow to Henrico or to the new [WWTP] in order to offload more flow from Henrico in the future[;]" and (5) the County "formally withdrew" its original permit application seeking authority to construct the TC Interceptor and represented that it had "removed [that component] from its Comprehensive Plan." A.R., at 2657; 2715.

The December 10 and 27 MFRs conclude by noting that, although "[t]he County does not claim that some portion of the [TC Interceptor] will never be built in the future," it had "outlined a number of future options for handling sewage ... that do not involve the construction [of that

---

24. The County explained that this decrease in development was the result of the facts that "[l]arge tracts of land have been designated as historic districts" and that "the County's hopes to attract a [computer] chip [manufacturing] plant to locate within [its borders] did not materialize." *Id.*

component]" and had represented that it could "not justify spending $7 million for the [TC Interceptor] when [it has] much less expensive options to satisfy [its] needs for the next 7 to 10 years which can be phased in as needed." *Id.* Upon those representations, Ms. Painter explained, the Corps "determined that [the] County ha[d] fully disclosed all of the activities that are reasonably related to the project and ... that the [JPA] is complete ...." A.R., at 2657; 2715. That conclusion is articulated in the Corps' April 4 MFR in the following terms:

> [T]he [Corps'] District Engineer determined ... that Hanover County has fully disclosed all of the activities that are reasonably related to the project, and that the application before the Corps is for a single and complete project with independent utility from the previously proposed [TC Interceptor] as well as from any future improvements to the conveyance of wastewater within the County.

A.R., at 6.

### c. The Corps' Public Interest Review And The Plaintiffs' Comments

Having determined that the County's application was complete, and having issued public notice respecting the forthcoming regulatory review of the project described therein, the Corps set about to determine whether to authorize the County to proceed with construction of its revised project.[25] On December 14, 2001, Ms. Painter visited the sites on which the components of the project would be built "in order to verify the wetland impacts of the previously proposed portions of the

project and to evaluate the potential impacts of the newly proposed Lee Davis pump station." A.R., at 6; 2674–75. At the conclusion of that site-visit, and as memorialized her (undated) Site Visit Report, Ms. Painter made the following recommendation:

> *From field observations and desk top review,* it can be concluded that the *magnitude* of the proposed and completed *impacts to wetlands and waters of the U.S. are minimal and could be authorized by general permits.* It appears that the proposed discharge outfall structure would qualify for Nationwide Permit # 7; the completed wetland impacts at the WWTP would qualify for Nationwide Permit # 39; and the proposed utility line activities at the Lee Davis pump station would qualify for Nationwide Permits # 12 and # 18. However, this *preliminary determination is contingent upon verification that the project would meet the other terms and conditions of these Nationwide Permits as well as a review of comments* received from state, federal and local agencies and the general public in response to the Corps' Public Notice.

A.R., at 2674–77 (emphasis supplied). Again, Ms. Painter noted that "[t]he originally proposed [TC Interceptor] has been replaced by the proposed Lee Davis [Alternative, therefore,] [t]he wetland impacts associated with the [TC Interceptor] are neither part of the project that is before the Corps nor are they in their entirety reasonably foreseeable cumulative impacts of the project." A.R., at 6–7.

---

**25.** The Corps' December 11, 2001 issuance of public notice provided for a 30 day period (to end January 11, 2002) within which the public could submit comments respecting the County's revised project. At the request of the Plaintiffs and others (including the United States Fish and Wildlife Service), however, the Corps extended that period through January 25, 2002 because it partially coincided with the holiday season. A.R., at 6; 2159; 2161; 2717.

It does not appear that the Corps ever informed the public (including the Plaintiffs) that, based upon its initial review, and contingent upon the receipt of certain information, it had concluded that the County's revised project might qualify for NWPs. However, it seems clear that, even before it issued notice to the public seeking comments on the November 16 JPA, the Corps internally had arrived at a tentative decision (*i.e.*, a "preliminary determination [that was] contingent" upon certain conditions) that NWP verifications might be appropriate.

Notwithstanding that fact, the record reflects that, over the next few months, the Corps continued to receive comments from the public, including the Plaintiffs, and proceeded with a thorough regulatory review of the County's revised project.[26] In particular, on January 18, 2002, the Corps conducted another field visit, this time for the purpose of meeting with the principal opponents of the County's project (*i.e.*, the Plaintiffs and their counsel), at which those parties "outlined their concerns about water quality, inclusion of the [TC Interceptor] as part of the project, consideration of other alternatives[,] and potential effects to anadromous fish in the Pamunkey River." A.R., at 6; 2731–32. Ms. Painter's January 31, 2002 Memorandum for the

Record memorializes the "concerns and arguments" that the Plaintiffs raised during that January 18 field meeting. As noted, those concerns involved the issues whether operation of the County's proposed project would unreasonably impair the Pamunkey River; whether the County had been "forthcoming with [its] actual intentions" respecting construction of the TC Interceptor; whether the County had chosen the best location for its proposed wastewater discharge structure; and whether the County thoroughly had considered entirely different (*i.e.*, regional) alternatives to its wastewater treatment problem. *Id.*

Further, on January 25, 2002,[27] counsel for the Plaintiffs submitted to the Corps a twenty-six page letter discussing, in great detail, the Plaintiffs' positions with respect to the County's project, A.R., at 1613–38, as well as numerous other documents in support of those positions. A.R., at 1609–2068. The Plaintiffs advanced the following five main arguments: (1) the County's application was incomplete and, therefore, should be rejected, because it did not include all of the activities that the County planned to undertake and that were reasonably related to the project—namely, it did not include the TC Interceptor;[28] (2) in the alternative, if the County truly did not intend to construct the TC Interceptor,

---

26. That kind of review, which included the Corps' receipt of comments, and necessary approvals, from several federal and state regulatory agencies, A.R., 9–19; 24–31, would have been neither necessary nor appropriate had the Corps, by this point, already decided that the County could proceed under the authority of NWPs. Indeed, the record indicates that, as late as February 13, February 25, and March 6, 2002, representatives from the Corps were responding to public comments by way of a form letter that states, in relevant part, that "[t]he project is presently under review by the [Corps'] staff for an *individual* ... [p]ermit." A.R., at 2431; 2496; 2614; 2617; 2622; 2625; 2629 (emphasis supplied).

27. Although counsel for the Plaintiffs mistakenly dated this letter 2001, it is obvious from its context that, in fact, it was written in January of 2002.

28. The Plaintiffs proffered the following assertions in support of their argument that the County still intends to construct and operate the TC Interceptor: (1) the County's own planning documents indicate that it must provide wastewater treatment service to the Totopotomoy Creek basin, and those documents have not been modified to reflect the County's purported abandonment of the TC Interceptor; (2) the County has refused to state that it will not build the TC Interceptor and has taken no steps to divest its right-of-way easements for that pipeline; (3) the County is

then the application must be denied because, in that event, the WWTP would not need to be constructed in wetlands at all (a fact which would cause the project to violate the Environmental Protection Agency's "Section 404(b)(1) Guidelines"); [29] (3) the County already had conceded that "less damaging alternatives to its outfall location are available"; (4) the project would result in environmentally damaging, and illegal, discharges into the Pamunkey River; and (5) the County had overstated its need for additional wastewater treatment capacity and had failed properly to consider reasonable alternatives to the project it has proposed. A.R., at 1613–14.

Further still, and on the same day, plaintiff, Henry Ruffin Broaddus, wrote a letter to Ms. Painter in which he "urge[d][her] to deny [the County's] application." A.R., at 2162–67. Setting forth personal, scientific, and policy arguments against the County's proposal (some of which echoed those that his attorney had advanced), Mr. Broaddus appealed to the Corps, as "the regulatory agency that is above the fray of local politics[,]" to look beyond the County's representations. A.R., at 2167.

### d. The Corps' Internal Deliberations And Continuing Dialogue With The Parties

A January 29, 2002 internal Corps e-mail contains information respecting a meeting that recently had taken place within the Corps, the subject of which was "Hanover County." A.R., at 2854. The participants included several Corps representatives, including Ms. Painter and Colonel Hansen, as well as representatives of the United States Department of Justice. That e-mail states, in relevant part, as follows: [30]

> The Colonel's desire is that if the project qualifies for a NW then it should be authorized as such.... From the Colonel's perspective, he does not want to prejudice Hanover County with an IP just because there is a threat of an additional lawsuit. He believes this would set a bad precedent and undermine the validity of NW authorization for projects that do indeed qualify. He would rather issue the NW if it's the right thing to do and risk the lawsuit.

> As a compromise I suggested that, since the project is out on PN [public notice] and the comment period will close this week, we go ahead and complete the environmental and public interest review. Basically, we will use the results of the analyses to document that either the project has only minimal impacts, in which case we can issue the NW, or show that the impacts are more than minimal and the IP is necessary.

continuing to rely upon, and to promote, the construction of at least a substantial portion of TC Interceptor (which will be built by a private developer to serve a new residential development in the SSA); (4) the County previously has attempted to piecemeal its wastewater treatment system improvements project; and (5) the County has strong incentives not to disclose its intention to construct the TC Interceptor (or a similar pipeline).

**29.** The purpose of the Section 404(b)(1) Guidelines "is to restore and maintain the chemical, physical, and biological integrity of waters of the United States through the con-

trol of discharges of dredged or fill material." 40 C.F.R. § 230.1(a), *et seq.; see also* 33 U.S.C. §§ 1344(b)(1); 1344(e)(1). Compliance with those Guidelines is a mandatory condition precedent to the promulgation of NWPs and also is a component of the Corps' review of applications for individual permits.

**30.** The Corps has redacted certain portions of that e-mail under an assertion that they are subject to the attorney-client privilege, and the Plaintiffs have not challenged that assertion.

The Colonel is OK with this .... I believe that as long as we complete and use the environmental analysis to determine whether or not the project has less than minimal impact and base our decision on that, we should be on good footing. This approach would place in the administrative record the environmental documentation to support whatever decision we eventually make.

*Id.*

On January 31, 2002, Ms. Painter sent an e-mail to a representative of the County requesting information "concerning the originally proposed [TC] Interceptor ... for the Corps' review of the potential cumulative impacts of the County's proposed ... project." A.R., at 1575. Specifically, Ms. Painter sought information respecting the following topics: (1) "the present status of the [TC Interceptor] relating to the County's Comprehensive Plan[,] as well as any future actions regarding the Plan and future [Capital Improvement Projects;]" (2) whether, and on what dates, "developers for new subdivisions (such as the currently proposed Bell[ ] Creek)" might undertake construction of "some sections" of the TC Interceptor "or similar alignments in Totopotomoy Creek[;]" (3) whether, as suggested in certain comments that the Corps had received, "since land for the [TC Interceptor] easement has already been purchased (or condemned), the [TC Interceptor] will eventually be built[;]" and (4) "the current utility of the inflow pump station at the treatment plant site in rela-

tion to the originally proposed [TC Interceptor]." [31] *Id.*

### i. The County's Response To The Corps' Questions

The County responded to Ms. Painter's request for information by letter dated February 1, 2002, in which it addressed each of the issues that Ms. Painter had raised. A.R., at 1506–12. Without going into exhaustive detail with respect to each of those issues, the County proffered the following answers to Ms. Painter's questions. First, as to Ms. Painter's question respecting the status of the TC Interceptor, the County responded that, as of November 28, 2001, its Board of Supervisors had "eliminated the [TC] Interceptor from the County's Capital Improvement Plan ... and replaced it with the Lee Davis [Alternative]." According to the County, that meant that "all funding" for the TC Interceptor also had been eliminated, and that "[f]or all practical purposes, the project no longer exists ...." A.R., at 1506.

The County then explained the difference between two planning documents, its Comprehensive Plan and its Capital Improvements Plan which, in its estimation, had created some "confusion." A.R., at 1507. The County described the former plan, which is updated every five years, as being only "conceptual in nature[.]" It noted that not all of the improvements or projects described or portrayed in its Comprehensive Plan will, in fact, come to

31. Also on January 31, 2002, Ms. Painter documented a conversation that she had with a representative of the Virginia Department of Health respecting the County's project. A.R., at 2734. She described the opinions of that representative as follows:

> He said from the Health Department's point of view, the treatment plant is where it ought to be and that it was a good project. He said the discharge location is where it has to be and that the water from

> the discharge pipe will actually be cleaner than the water in the Pamunkey River. He said the Health Department could foresee no water quality problems associated with this discharge.

*Id.* That conversation, of course, took place before the Virginia Department of Environmental Quality listed the Pamunkey River as an impaired one because it contained excess quantities of fecal bacteria. *See supra*, note 1.

fruition. Rather, "[a] variety of issues could eliminate or significantly change a facility that is shown conceptually in the Comprehensive Plan." *Id.* As such, although that document "shows facilities that are believed to be necessary to implement" the County's "smart growth" policy, it does not "precisely" locate, fund, or set the timing for such facilities, nor does it guarantee that any particular facility ever will be built. *Id.*

In contrast, the County explained, the Capital Improvements Plan "is where the [County's] Board of Supervisors actually approves funding for 'real' projects." A.R., at 1508. That is to say, potential improvement projects are included in the Capital Improvements Plan only after the Board designates specific funds for those projects, and, in the County's view, such potential projects "become actual projects" only at that time. *Id.* Thus, as noted above, it was the County's position that "[w]hen the funding was eliminated for the [TC Interceptor], it ceased to be a County project." *Id.*

The County also discussed the Shelton Pointe Pump Station, which the County had built, and begun operation of, in early 1998 "[i]n order to provide sewer service" to a portion of its SSA that . . . recently had [been] phased in.[32] *Id.* Although it had built that pump station before "knowing the location of [the WWTP]," the County stated that, once it had done so, "it satisfied the need to provide wastewater service [to the area that the Shelton Point Pump Station serves] in support of the Comprehensive Plan." *Id.*

The County represented that "a sewer may never be required between Rural Point Road and the WWTP along Totopotomoy Creek, an area outside of the [SSA]. Sewage can be pumped from the Shelton Pointe Pump Station or another station to either Henrico County or to the new WWTP, if it is permitted and constructed." *Id.* The author of the February 1 letter also represented that, at the County's upcoming planning meeting, he would be "recommending that the section of the sewer line . . . outside of the [SSA] be eliminated."[33] *Id.* Finally, he stated that:

In terms of the [Capital Improvements Plan], I will be recommending improvements to facilities in the Lower Totopotomoy Creek Basin within the [SSA] on an as needed basis and in response to the actual development that occurs. This is just as I would do in any other part of the [SSA]. At this time, the only funding that I anticipate recommending to the Board of Supervisors during the next several years is funding for an upgrade to the Shelton Pointe Pump Station, which is essentially the replacement of pumps and motor controls which are anticipated to be needed in 2–3 years, funding for oversize credits, and perhaps improvements to allow consolidation of several pump stations in the general vicinity of Route 301 and Totopotomoy Creek.

A.R., at 1508–09.

Next, the County responded to the Corps' request for information about certain portions of the TC Interceptor that "may be proposed by developers for new subdivisions (such as the currently pro-

<hr/>

**32.** The Shelton Pointe Pump Station is located near the eastern boundary of the County's SSA. The County's Water and Wastewater Facilities Master Plan reflects that, in or about 2003, the County intended to divert wastewater from that pump station to the WWTP by means of a 48 inch sewer line. A.R., at 1643.

Currently, however, the Shelton Pointe Pump Station pumps sewage to Henrico County.

**33.** The author of the February 1 letter is Mr. Frank Harksen, who is the Director of the County's Department of Public Utilities.

posed Bell Creek) ...." A.R., at 1575. The County explained that, as it had discussed with the Corps at the [November 9, 2001] pre-application meeting, it "expected that there would be further projects constructed by developers within the Lower Totopotomoy Creek Basin," that it "expected an application to be submitted for the Bell Creek Development in the immediate future[,]" and that it had made its design plans for the TC Interceptor available to the developer [of the Bell Creek] project "because [it] believed that [it] had selected the best alignment for any sewer project within the Totopotomoy Creek Basin." A.R., at 1509. Moreover, the County stated as follows:

> [T]he County ha[s] entered into a *development agreement* for Bell Creek and ... the proffers for the project stated *if the County did not build the [TC Interceptor], that the developer would have to build a sewer from Academy Creek to the Shelton Pointe Pump Station.* We also informed the Corps ... that the *County would be paying for part of the construction of this project in accordance with the development agreement and the County's oversizing policy.* These activities are all standard practice within the County.

> It is important to note that the development agreement was executed in November 2000 and the proffers ... for this project were submitted in October 2000.... The fact that the proffers recognized the fact that the County may not be building the [TC Interceptor] at this early date and the sewer service could be provided to the Bell Creek Development through the Shelton Pointe Pump Station, independent of the Totopotomoy Creek Sewer Interceptor, dem-

onstrates the independence of these projects.

*Id.* (emphases supplied).

The County explained that the Bell Creek project was the "only one [it was] currently aware of[,]" and that the developer of that project had informed the County that he hoped to have the homes in that development built, and occupied, by the fall of 2002, or "long before the County will have its WWTP project operating." *Id.*[34] It stated that the sewer envisioned by the developer would connect to the Shelton Pointe Pump Station, "which currently pumps to a trunk sewer that eventually goes to Henrico County for treatment[,]" and that it will continue to do so unless the County's plans for the WWTP are approved, at which point sewage from the Bell Creek development could be conveyed to the WWTP. *Id.* The County also proffered the following additional information respecting the sewer project proposed by the developer of the Bell Creek project:

> [A]lthough the Bell Creek trunk sewer is using a portion of the corridor that was originally developed for the [TC Interceptor], a 30″ sewer is planned to be installed, not the 42″ sewer that was proposed with the [TC Interceptor] project. The average flow capacity of this 30″ sewer is approximately 4.8[mgd] which is less than half the average flow capacity of 12.0 mgd for the 42″ sewer that was once proposed by the County. The Bell Creek trunk sewer is also designed to allow the wastewater to flow into the Shelton Pointe Pump Station whereas the [TC Interceptor] was designed to accept flow from upstream of the Shelton Pointe Pump Station. These are obviously different projects serving different needs.... The County has no plans to construct any portion of

---

**34.** According to the record, and as of April 4, 2002, the Corps has not yet acted on the application for individual permits that the developer of the project submitted. *See infra.*

the [TC Interceptor] nor [is the County] aware of any other active development project that would require the construction of any portion of it.

A.R., at 1510.

Next, the County addressed the suggestion that its purchase or condemnation of land along the original intended route of the TC Interceptor evinced that, in fact, the County still intended to construct that project. The County's response was that, although forty "of the easement[s] required for the [TC Interceptor] have been purchased by the County[,]" thirteen such easements "have not been obtained." *Id.* The County explained that:

There is not a continuous corridor for the [TC Interceptor] at this time and the County is not making any additional efforts to obtain additional easements. All of the easements that have been obtained were obtained through negotiations with property owners. No easements were condemned ... nor is there any plan to do this. The County Staff was preparing to ask the Board of Supervisors to begin condemnation proceedings for those easements that were outstanding but this was not done as the decision was made to cancel the project.

*Id.*

The County also noted that, within the SSA, it "often obtains utility easements during the development process that may be required to serve adjoining properties. Sometimes these easements are utilized and sometimes they are not.... [T]he fact that future development within the [SSA] may be able to utilize easements within this area for pump stations or collector sewers to serve individual developments is reason enough for the County to keep

these particular easements at this time." A.R., at 1510–11. But, it explained that, if it were to become apparent that a given easement never would be used, the County would "certainly consider vacating them on a case by case basis." A.R., at 1511.[35]

Finally, the County responded to the Corps' request for information concerning "the current utility of the inflow pump station [or "IPS"] at the [WWTP] in relation to the originally proposed [TC Interceptor]." A.R., at 1575. On that issue, the County explained as follows:

The IPS served multiple functions including pumping wastewater from the [TC Interceptor] up to the WWTP; collecting and pumping plant process water; and collecting, grinding[,] and pumping septage [sic] delivered to the WWTP by septage [sic] hauling contractors. The Lee Davis [Alternative], which replaces the [TC Interceptor], could discharge to either the IPS or directly to the WWTP screening facilities and each discharge point has its advantages and disadvantages. At this point it appears it will be more cost effective to have the Lee Davis ... facilities discharge directly to the WWTP screening facilities therefore the IPS is no longer needed to pump wastewater to the WWTP.

The County ... has decided to halt any additional IPS construction and [is] proposing to abandon it.

Although we will no longer be constructing the IPS, the wetlands impacts for the WWTP project are ... the same because the wetlands have already been taken and construction of required drainage improvements and erosion and

---

**35.** Mr. Harksen also explained that he saw "no reason for the County to keep the easements it obtained between Rural Point Road and the WWTP [*i.e.,* the portion of the route of the TC Interceptor that he was recommending elimination of]." *See supra;* A.R., at 1511.

sediment controls will still require impacting this same area.

A.R., at 1511–12.

### ii. The Plaintiffs' Comments Respecting The "Bell Creek" Project

On February 11, 2002, counsel for the Plaintiffs sent a letter to the Corps in reference to a separate permit application that a private developer called The Hanover Group had submitted to the Corps on December 13, 2001. A.R., at 2194–98. The Hanover Group's application sought the Corps' authorization to discharge dredged or fill material in connection with its intended construction of a mixed-use development on approximately 300 acres of land located in the northeast portion of the County's SSA. The Plaintiffs informed the Corps that the County's Planning Commission had approved plans for the "Bluffs at Bell Creek" development on June 7, 2001, and that those plans included the construction of over 7,500 feet of gravity sewer line.[36] The Plaintiffs also advised the Corps that over 2,200 feet of that sewer line, the construction of which was expected to result in substantial impact to wetlands, was planned to lie along the path of, and to utilize easements that the County had obtained for, the formerly proposed TC Interceptor. *Id.*

Construction of that 2,200 feet of sewer line, the Plaintiffs contended, was essentially the same as construction of the TC Interceptor and, inevitably, will lead the County to construct additional portions of that interceptor to convey wastewater from the Totopotomoy Creek basin directly to the WWTP.[37] *Id.* Accordingly, the

Plaintiffs urged the Corps "to look beyond the 'shell game' being played by [the] County, with the assistance (whether or not knowing) of [T]he Hanover Group[ ]" and to recognize that "[t]he TC Interceptor—and all portions of it—are the County's project[ ]" [and] must be included with the County's other sewage treatment system improvements in the County's currently pending permit application." A.R., at 2198.

### iii. The Review Process Comes To A Close

The record also contains a dialogue that took place through e-mail February 20, 2002 between Ms. Painter and Mr. Herzog. A.R., at 1589. First, Mr. Herzog e-mailed Ms. Painter "to verify that [the Corps] currently ha[s] all the information that has been requested from [the County]." *Id.* Next, Ms. Painter responded to remind Mr. Herzog that he "had said [that he] wanted to provide a response to the comments submitted by [counsel for the Plaintiffs]." *Id.* She noted that, although the County was not required to comment, the opportunity to do so was available. Finally, Mr. Herzog replied as follows:

We reviewed all the public comment letters received by the [Corps], including the letter submitted by [counsel for the Plaintiffs], on February 7, 2002 at your office. We believe that we have addressed all of the major issues associated with the permitting of these projects raised in the public comment letters that were received as of this date. These issues have been addressed by both the information provided with the original

---

36. As should be obvious, the "Bluffs at Bell Creek" (or "Bell Creek") project is the project about which the Corps inquired, and to which the County referred, in the January 31 e-mail and February 1 letter, respectively. *See supra.*

37. Counsel opined that "once the [WWTP] is authorized and built, and a portion of the TC Interceptor is buil[t] for [the] County by The Hanover Group, the full sewer main along Totopotomoy Creek will become an inevitable means of collecting sewage and delivering it to that location." A.R., at 2198.

permit application and the supplemental information submitted in response to the specific questions posed by your office. We appreciate being given the opportunity to review and respond to the public comment letters but, at this time, we are not planning on addressing any particular comment letter unless the [Corps] requests it.

*Id.*

On March 8, 2002, however, Mr. Herzog sent another e-mail to Ms. Painter, apparently in response to a question that she had posed respecting "available capacity at Henrico and the timing of the proposed WWTP." A.R., at 1597. That e-mail states, in relevant part, as follows:

Wastewater flows fluctuate and are highly dependent on weather. Exact predictions of sewage flow are not possible as precisely how many new customers will connect to the system and what future weather conditions will be are not known.... We believe that flows to Henrico are currently below our predictions primarily due to the dry weather conditions the entire region has been experiencing. As we are all aware, our region is currently in an extended drought but, this could change tomorrow. In 1998, wastewater flows to Henrico were 4.5 mgd, which was approximately 500,000 gpd over our projection for that year. Since 1998 we have added over 1,500 new customers to our sewage system and currently have approximately 4,000 zoned lots in inventory that could be developed and connected to the sewer system at anytime. *Using an average daily flow of 350 gpd/unit, these 5,500 units would add 1.9 mgd to [the County's] average flow.*

*Id.* (emphasis supplied).

### e. The Corps' April 4, 2002 Memorandum For The Record

On April 4, 2002, the Corps issued the April 4 MFR, its final decisional document,

in which it explained that, and why, it had verified that the County could proceed with construction of its proposed project under the authority of four NWPs (numbers 7, 12, 18, and 39). A.R., at 1–65. In the section of the April 4 MFR entitled "Findings and Decision of the District Engineer", the Corps states, in relevant part, as follows:

The District Engineer has determined that the decision on this project is not a major Federal action significantly affecting the quality of the human environment. Therefore, no Environmental Impact Statement will be prepared. This finding is based on information contained in the [Corps'] evaluation of the project and comments received from Federal, State, and local agencies and the general public.

The District Engineer has fully evaluated [the] County's application and has determined that it represents a single and complete project and that the applicant has disclosed all reasonably related activities.... The wetland impacts associated with the originally proposed [TC Interceptor] are no longer a part of the project that is before the Corps and are not reasonably foreseeable impacts of the project. The proposed work by others along a portion of the original [TC Interceptor] alignment is not reasonably related to [the] County's project and will be evaluated by the Corps as part of The Hanover Group's application for a multi-use development. Future treatment and conveyance projects that will be developed by the County when the need arises must be reviewed for compliance with the applicable State and federal laws and approved or denied as appropriate.

The individual and cumulative wetland impacts associated with this project and

minimal, and there will be no adverse effects to historic resources and no impacts to federally-listed threatened or endangered species.

A.R. at 38.

In support of its decision to verify that the project could proceed under the authority of NWPs notwithstanding that the County had submitted an individual permit application (and, accordingly, that the Corps had proceeded for several months under the regulations applicable thereto), the Corps cited 33 C.F.R. § 330.4(e)(3). That provision states: "The division or district engineer will restore authorization under the NWPs at any time he determines that his reason for asserting discretionary authority has been satisfied by a condition, project modification, or new information." The Corps explained that, "[b]ased on the results of the [December 14, 2001] field evaluation, the elimination of the [TC Interceptor] as a component of the project, and the fact that no new issues were identified in response to the Public Notice or subsequent coordination with appropriate State and Federal resource agencies that would preclude the use of general permits, the District Engineer determined that it was appropriate to consider the project under the Nationwide Permit program." A.R., at 38.

## II. DISCUSSION

### A. Standard Of Review

#### 1. Principles Respecting Judicial Review Of Agency Action

■■■■ A district court shall "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2). Challenges to permitting actions by the Corps, under CWA, NEPA, and NHPA, are subject to the deferential standard of review set out in the APA. *See*

*e.g., Marsh v. Oregon Natural Resources Council,* 490 U.S. 360, 377, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989) (NEPA); *Morongo Band of Mission Indians v. Fed. Aviation Admin.,* 161 F.3d 569, 573 (9th Cir.1998) (NHPA); *Preserve Endangered Areas of Cobb's History, Inc. v. U.S. Army Corps of Engineers,* 87 F.3d 1242, 1247 (11th Cir. 1996) (CWA); *Shoreline Assocs. v. Marsh,* 555 F.Supp. 169, 173 (D.Md.1983), *aff'd,* 725 F.2d 677 (4th Cir.1984) (same). The party asserting the challenge bears the burden of demonstrating that the agency's actions were arbitrary, capricious, or otherwise not in accordance with law. *See, e.g., Sierra Club v. Marita,* 46 F.3d 606, 619 (7th Cir.1995). The scope of judicial review "is narrow and a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983).

■■■■ In order for its decision to satisfy this deferential level of review, however, "the agency must [have] examine[d] the relevant data and [have] articulate[d] a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Id.; Baltimore Gas & Elec. Co. v. Natural Resources Defense Council, Inc.,* 462 U.S. 87, 105, 103 S.Ct. 2246, 76 L.Ed.2d 437 (1983) (citations omitted). A reviewing court cannot supply the reasoned basis for the agency's action, but the court is obligated to " 'uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned.'" *Id.* (citation omitted). Thus, the court's "task is to scrutinize the [agency's] activity to determine whether the record reveals that a rational basis exists for its decision." *Natural Res. Defense Council, Inc. v. United States Environmental Protection Agency,* 16 F.3d 1395, 1401 (4th Cir.1993). If so, the court must uphold the agency's action. The agency's decisions also are due deference

by the judiciary in the interpretation of the statutes that the agency administers, in the interpretation of its own regulations, and in the area of its expertise. *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984); *Christensen v. Harris Co.,* 529 U.S. 576, 120 S.Ct. 1655, 146 L.Ed.2d 621 (2000).

That said, a court's review may not serve as a "rubber stamp" to the agency's decisions, *Citizens Awareness Network, Inc. v. U.S. Nuclear Regulatory Comm'n,* 59 F.3d 284, 290 (1st Cir.1995), and situations will arise in which courts are reluctant to afford an administrative agency the full measure of deference to which it otherwise would be entitled. That is to say,

> [m]ore exacting scrutiny will be particularly useful when for some reason the presumption of agency regularity . . . is rebutted, as where the agency has demonstrated undue bias towards particular private interests, . . . where the agency has had a history of 'ad hoc and inconsistent judgments' on a particular question, . . . where the agency has arrived at an identical result after remand from a reviewing court for further explanation of reasons, . . . or when an agency has departed from its consistent and longstanding precedents or policies[.]

*Natural Resources Defense Council, Inc. v. SEC,* 606 F.2d 1031, 1049, n. 23 (D.C.Cir.1979) (citations omitted); *see also Maggard v. O'Connell,* 671 F.2d 568, 570–71 (D.C.Cir.1982) (explaining that "the deference owed to an expert tribunal cannot be allowed to slip into a judicial inertia . . . and judicial intervention is required if the court becomes aware, especially from a combination of danger signals, that the (tribunal) has not really taken a 'hard look' at the salient problems, and has not genuinely engaged in reasoned decision-making.") (citations omitted).

An agency may neither "ignore evidence placed before it by interested parties[,]" *Consumers Union of U.S., Inc. v. Consumer Product Safety Commission,* 491 F.2d 810, 812 (2d Cir.1974); *Van Abbema v. Fornell,* 807 F.2d 633, 639 (7th Cir.1986), nor rely on post-hoc rationalizations or justifications in supporting its decisions, *see e.g., Motor Vehicle Mfrs. Ass'n of the United States, Inc.,* 463 U.S. at 49–50, 103 S.Ct. at 2870 (stating that "[i]t is well-established that an agency's action must be upheld, if at all, on the basis articulated by the agency itself.") (citations omitted); *Tanners' Council of America, Inc. v. Train,* 540 F.2d 1188, 1194 (4th Cir.1976); *U.S. v. Garner,* 767 F.2d 104, 116–17 (5th Cir.1985). And, in the final analysis, agencies "earn[ ]—or forfeit[ ]—deferential judicial review by [their] performance." *N.L.R.B. v. Winnebago Television Corp.,* 75 F.3d 1208, 1214 (7th Cir. 1996).

### 2. The Appropriate Measure Of Scrutiny In This Case

Having set forth the principles applicable to judicial review of agency action, it is appropriate to consider the manner in which those principles bear on the ensuing review of the record in this case. As noted at the outset, neither that review, nor the deferential scrutiny through which it must be undertaken, realistically can be divorced from the events that animated *Crutchfield* I (to which this case intimately is linked).

Specifically, it must be remembered that "the Corps predicated its original decision on a remarkably illogical premise, persuaded the Virginia Department of Historic Preservation to change its view on the central topic respecting how to evaluate the project, and summarily rejected the Plaintiffs' comprehensively documented contentions about the criteria for, and ap-

proach to, evaluating the project." *See Crutchfield*, 192 F.Supp.2d at 461 (*citing Crutchfield*, 154 F.Supp.2d at 898). The review of the Corps' permitting process, and decision on the merits in *Crutchfield* I, revealed that the Corps' erroneous judgment respecting the County's originally proposed project arose not merely by virtue of a mistaken interpretation of its regulations, or by a genuinely innocent oversight as to crucial facts of record. Rather, it was quite clear that the Corps, at the urging of the County, had arrived at a determination that was little more than an irrational contrivance of expediency designed for the deliberate purpose of evading the kind of environmental review that must accompany consideration of individual permit applications. *Crutchfield*, 154 F.Supp.2d at 897.

The foregoing is neither by way of condemnation nor to suggest that the settled jurisprudence respecting review of agency actions is inapplicable here. To the contrary, the Corps' decisions that presently are under scrutiny are subject to the same careful and thorough appraisal, and are entitled to the same measure of respect as to technical matters, as in any "record review" case. At the same time, however, the tasks with which the reviewing court is charged—reviewing the administrative record as a whole, ensuring that the agency fairly considered the facts with which it was presented, confirming that the evidence rationally supports the agency's ultimate decision, and considering whether the agency's interpretation of its organic statutes and implementing regulations are consistent with both the language of those laws and the intent of Congress, logically (and legally) will be influenced by past experience in respect of the Corps' handling of a closely related situation. With that in mind, it is appropriate to turn to the issues presented by the Plaintiffs' challenge in this case, and to take a "hard look" at the administrative record as it pertains to those issues. Given the history respecting the Corps' earlier poor performance on virtually the same issues, and taking into account that the agency arrived at virtually the same decision after judicial remand, it is regrettably appropriate to assess the Corps' reasoning with heightened scrutiny. *Natural Resources Defense Council, Inc. v. SEC*, 606 F.2d at 1049; *Maggard v. O'Connell*, 671 F.2d at 579–71.

## B. The Issues Presented For Review

The Plaintiffs' challenge presents the following three basic issues for review:

(1) Does the record support the Corps' decision that the County's November 16, 2001 Joint Permit Application included all activities that the County plans to undertake which are "reasonably related" to the project described therein, and, therefore, that the Joint Permit Application was "complete?"

(2) Did the Corps violate its own procedures, when, after conducting its review of the County's Joint Permit Application under the procedures applicable to individual permits, it ultimately decided to authorize the County to proceed under the authority of Nationwide Permits?

(3) Does the record support the Corps' determination that the project for which the County applied was a "single and complete project," such that it could be authorized pursuant to multiple Nationwide Permits?

## C. Analysis

### 1. The Corps' Decision That The County's November 16 JPA Included All Activities That Are "Reasonably Related" To The Same Project And, Therefore, Was "Complete" Within The Meaning Of 33 C.F.R. § 325.1(d)(2)

The first issue that the Plaintiffs have raised is whether the Corps reached an

arbitrary, capricious, or otherwise unlawful decision respecting whether the County's November 16 JPA included "[a]ll activities which the applicant plans to undertake which are reasonably related to the same project and for which a [Corps] permit would be required[.]" 33 C.F.R. § 325.1(d)(2). Because the Corps failed rationally and independently to consider whether, in fact, the County should have included in its JPA other activities that it, and others, plan to undertake, the Corps' decision must be set aside.

### a. Whether The "Reasonably Related" Requirement Of 33 C.F.R. § 325.1(d)(2) Even Applies In This Case

■ 33 C.F.R. § 325.1(d)(2) states:

All activities which the applicant plans to undertake which are reasonably related to the same project and for which a DA permit would be required should be included in the same permit application. District engineers should reject, as incomplete, any permit application which fails to comply with this requirement. For example, a permit application for a marina will include dredging required for access as well as any fill associated with construction of the marina.

Both the County and the Corps argue that § 325.1(d)(2) does not apply in this case. Specifically, they contend that § 325.1(d)(2) is inapplicable because the Corps ultimately did not issue an individual permit, but, instead, verified that the County could proceed with its project un-

der the authority of four NWPs. In support of their argument, the defendants point to a part of the decision on the merits in *Crutchfield* I in which the "reasonably related" requirement codified at § 325.1(d)(2) was held not to apply to the Corps' decisions respecting verification of NWPs. *See Crutchfield*, 154 F.Supp.2d at 895 (holding that "the 'reasonably related' requirement of section 325.1(d) applies only to applications for individual permits, not to notifications of NWPs.").

The argument made by the County and the Corps utterly ignores the facts of record in this case. To begin, it is undisputed that the Corps received, issued public notice of, and began processing, the County's November 16 JPA as an application seeking individual permits.[38] A.R., at 5–6. The issuance of public notice respecting that JPA (which, as stated above, occurred on December 11, 2001) lawfully could not even have occurred absent a finding that the application was "complete" (*i.e.*, that it satisfied the "reasonably related" requirement).[39] *See* 33 C.F.R. § 325.1(d)(2); A.R., at 2158; 2658–61. Indeed, a determination of "completeness" pursuant to § 325.1(d)(2) would have been entirely unnecessary if the Corps was not reviewing what it considered to be an application seeking an individual permit.

As early as November 16, 2001, the Corps informed federal legislators that the review would be accomplished under the individual permit regime. And, as late as March 6, 2002, the Corps was representing

---

**38.** That, of course, is fully consistent with the Corps' representation to this Court that it would be reviewing the County's application as one for individual permits. *See supra.*

**39.** In addition, counsel for the Plaintiffs suggested at oral argument that the fact that the November 16 JPA did not include a cover letter "seeking specifically and explicitly a verification" that the County could proceed

with their project under the authority of NWPs, such as the County has submitted with such requests in the past, also supports a finding that the Corps was dealing with an application for individual permits. July 10, 2002, Transcript of Hearing, at 53 (hereinafter cited as "Transc., at ___"); A.R., at 1468–69.

to interested parties that it was undertaking its review of the County's application in the context of an individual permit. *See supra*, at note 26; A.R., at 2431; 2496; 2614; 2617; 2622; 2625; 2629. Finally, in the April 4 MFR (its final decisional document) the Corps presented, and attempted to support, the findings of "reasonable relatedness" and "completeness" at which it arrived pursuant to section 325.1(d)(2). A.R., at 5–6; 32–33; 38. Where, as here, the Corps clearly was undertaking its review of the JPA under the regulatory framework applicable to individual permits, and where it represented to the Court and to the public that it was so doing, judicial review cannot simply ignore that aspect of the Corps' actions. It is disingenuous of the defendants to suggest otherwise.[40]

■ In an effort to imbue this argument with a cloak of legitimacy, the defendants respond by repeating that what is under review is the Corps' *ultimate* decision—that the County could proceed under the authority of NWPs—not some "hypothetical" decision. That argument ignores the fundamental precept that judicial review of agency action is not limited merely to the Corps' "ultimate" decision but, instead, properly extends to the process by which it arrived at that decision. That aspect of judicial review is well-settled. *See e.g., Bettucci v. United States*, 14 F.Supp.2d 45, 52 (D.D.C.1998); *Jarett v. United States*, 195 Ct.Cl. 320, 451 F.2d 623, 626 (1971); *United States v. District Council of New York City and Vicinity of*

*United Broth. of Carpenters and Joiners of America*, 880 F.Supp. 1051, 1066 (S.D.N.Y.1995); *Maine v. Shalala*, 81 F.Supp.2d 91, 95 (D.Me.1999); *Greene v. Babbitt*, 943 F.Supp. 1278, 1285 (W.D.Wash.1996) (*citing Atkinson Lines, Inc. v. United States*, 381 F.Supp. 39, 41–42 (S.D.Ohio 1974)). It would be inappropriate, especially in a case brought pursuant to statutory provisions that require a review of agency procedures, wholly to ignore an obvious reality respecting procedures that the Corps, itself, invoked as part of its final permitting decision. In this case, those procedures clearly involved an initial review and determination of whether the County's November 16 JPA was "complete." That determination is in no way "hypothetical."[41] Indeed, as is discussed in Section II.2 below, the Corps itself used this finding as part of its decision to convert the County's application for individual permits (which the County submitted in that form at the Corps' insistence) into a request for NWP verifications. Moreover, in the April 4 MFR, the Corps itself equated the "reasonably related" finding (which, of course, was the predicate for its finding of "completeness") with the "independent utility" finding that it made as part of its decision to issue the NWPs. A.R., at 6; 23; 38. *See supra*.

For the foregoing reasons, and notwithstanding the fact that the Corps' ultimate permitting decision took the form of NWP verifications, the review in this case properly must include assessment of the Corps' decision that the County's November 16

---

**40.** The decision in *Crutchfield* I holds that 33 C.F.R. § 325.1(d)(2) applies when the Corps is processing applications for individual permits. Because the Corps' "reasonably related" and "completeness" decisions in this case occurred as part of its processing of an application for an individual permit, *Crutchfield* I does not support the argument that the County and the Corps advance.

**41.** In that regard, the suggestion made at oral argument (by counsel for the County) that the Corps' inclusion (at several places) in its April 4 MFR of its determination that the County's November 16 JPA was "complete," and its presentation of the reasoning underlying that determination, is mere "surplussage," cannot be accepted. Transc., at 118.

JPA (which sought an individual permit), was "complete" because it included "all activities which are reasonably related to the same project." It is now appropriate to turn to that issue.

### b. Whether The County's Application Included All Activities That Are "Reasonably Related" To The Same Project Which The County Intends To Undertake

A central theme of the Plaintiffs' position in this case is that, in its November 16 JPA, the County failed to include all of the activities (*i.e.*, components of its wastewater treatment system) that are underway and that it will need to undertake (*i.e.*, to construct and operate) in order to achieve the stated, paramount goal of the project—reducing its dependency on Henrico for wastewater treatment capacity. In a related argument, the Plaintiffs assert that, in making the "completeness" decision (pursuant to 33 C.F.R. § 325.1(d)(2)), the Corps ignored the fact that the Lee Davis Alternative, on its own, would not fulfill the County's avowed purpose of ensuring that it does not exceed the limit under its contract with Henrico. According to the Plaintiffs, if the Corps had opened its eyes to what appears in the record, it would have been obvious that the County's project (using the Lee Davis Alternative) will not permit the County to achieve its objective.

That issue is of cardinal significance because a valid finding that a project will have only minimal environmental impacts, and thus is eligible to proceed pursuant to an NWP, cannot be made unless all reasonably related activities, in fact, are disclosed to, and considered by, the Corps.

For the reasons set forth below, however, the Corps' decision that the County had disclosed all "reasonably related" activities, and the Corps' dependent decision that the County's JPA was "complete," must be set aside.

### (1) The Corps' Finding Respecting Completeness

The record reveals that, on the basis of discussions with the County that took place on December 6, 2001, the subject of which was the County's future plans for treating wastewater generated within its borders, the Corps decided (apparently on December 10, 2001) that the County's November 16 JPA included "all reasonably related activities" that the County planned to undertake and, hence, that the application was "complete" within the meaning of 33 C.F.R. § 325.1(d)(2). *See supra.* The reasoning underlying that decision is set forth in Ms. Painter's December 10 MFR. A.R., 2656–57. It is repeated in her December 24, 2002 MFR (A.R., 2714–16) and is set forth, verbatim, in the April 4 MFR, the decisional document that is at issue here. A.R., at 5–6; 32–33; 38. As noted earlier, the Corps discussed the following considerations, and made the following findings, in support of its decision:

(1) "[a]lthough the Lee Davis [Alternative] will serve a portion of the Beaverdam Creek basin rather than the Totopotomoy Creek basin that would have been served by the [TC Interceptor], the resultant reduction in flow being sent to Henrico County will allow for continued transfer to Henrico County of sewage collected in the Totopotomoy Creek basin[;]"

(2) "the Lee Davis [Alternative] will provide wastewater flow to the [WWTP] in quantities nearly comparable to the [TC Interceptor] and will allow Hanover County to remain within its contractual limits of 5.4 mgd of treatment capacity with Henrico County for an additional 7–10 years with the anticipated 3 to 4% growth[;]"

(3) "when the Lee Davis [Alternative] comes on line, flow from the existing Shelton Pointe pump station would be diverted from Henrico County to the proposed [WWTP] through the Lee Davis pump station [and][l]ater, when warranted by development, the replacement of a portion of the proposed 16–inch pipe from the Lee Davis [Alternative] with a 20 to 24–inch pipe and other upgrades to the Shelton Pointe pump station would provide additional capacity for the Totopotomoy service area well beyond the anticipated 10–year period[;]"

(4) "[t]he County presently anticipates much less development (with less demand for sewer service) along the originally proposed [TC][I]nterceptor route than was expected when it was originally added to the Comprehensive Plan[;]"

(5) "[t]he County also indicated a new pump station for the Powhite Creek basin may be constructed as early as 2007 to pump flow to Henrico or to the new [WWTP] in order to offload more flow from Henrico in the future[;]"

(6) "[a]lthough the County does not claim that some portion of the [TC][I]nterceptor will never be built in the future by the County or others, they have stated that their more detailed evaluation does not justify spending $7 million for a new interceptor when they have much less expensive options to satisfy their needs for the next 7 to 10 years which can be phased in as needed[;]" and

(7) "[t]he County has formally withdrawn their permit application ... for the [TC][I]nterceptor and outlined a number of future options for handling sewage within the County that do not involve the construction of the [TC][I]nterceptor."

A.R., at 5–6; 32–33; 2656–57; 2714–16. On December 11, 2001, the Corps issued its notice to the public that it was considering the County's application. A.R., 2658–61.

**(2) The Plaintiffs' Arguments**

The Plaintiffs' argument that the Corps erred when it determined that the County's JPA was "complete" begins with the undisputed fact that a central purpose of the project is to divert a substantial amount of wastewater from Henrico (where it presently is treated) to the WWTP, thereby forestalling what the County has characterized as an imminent risk that it will exceed the limit (5.4 mgd) of its contract with Henrico.

To understand their argument, it is important to keep in mind several other undisputed facts. First, it is agreed that (using rounded figures) the Lee Davis Alternative initially would convey .7 mgd of sewage to the WWTP. Second, it is agreed that, to determine the amount by which the County's 90–day rolling average (under its contract with Henrico) would be reduced by use of the Lee Davis Alternative, it is necessary to multiply that .7 mgd figure by a so-called "peaking factor" of 1.142. It also is agreed that, after accounting for that adjustment, the result is that the Lee Davis Alternative initially would off-load from Henrico approximately .8 mgd (as calculated on the 90–day rolling average). Third, the County posited, and the Corps accepted, that the County's need for sewage treatment capacity will grow, as its population grows, by approximately 4% per year for the foreseeable future. The Plaintiffs have not disputed that figure.

Using those undisputed figures, the Plaintiffs have undertaken certain mathematical calculations which, they assert, demonstrate that, if the only sewage that is diverted from Henrico to the WWTP is

diverted by way of the Lee Davis Alternative, then the County will exceed its capacity under the Henrico contract by 2008. Given the .8 mgd quantity that the Lee Davis Alternative initially would convey to the WWTP (which, of course, is the same amount by which its flow to Henrico would be reduced), and assuming a 4% growth rate (as the County predicts), the Plaintiffs proffer that the amount of wastewater treated under the Henrico contract will be 4.6 mgd in 2003, 4.78 mgd in 2004, 4.97 mgd in 2005, 5.15 mgd in 2006, and 5.34 mgd in 2007. The contract threshold of 5.4 mgd will be exceeded, say the Plaintiffs, in 2008. Those figures are said to reveal that the Lee Davis Alternative must be augmented by some other means of supplying sewage to the WWTP if the project is to achieve its principal objective. Because the Corps did not consider those facts, the Plaintiffs submit, its finding that the County had disclosed all activities that are "reasonably related" to the project is fatally flawed.

The County responds to that argument by asserting that the Plaintiffs intermingled sewage flows from wet and dry years and that, as a result, the Plaintiffs' calculations are skewed. The County points to a document entitled "Wastewater Demand Projections" (A.R., 1411) in which it contends that the proper flow figures may be found.

That, however, does not aid the County because, if the amounts of flow that the County anticipates the Lee Davis Alternative would off-load (taking into account both the annual 4% growth and the 1.142 peaking factor) are subtracted from the base flow figures set forth in the document upon which the County would rely, the amount of sewage that would remain to be processed under the Henrico contract would be 4.92 mgd in 2003, 5.40 mgd in 2004, 5.87 mgd in 2005, and 6.41 mgd in 2006.[42] In other words, the County would reach the maximum threshold under its contract in 2004 and exceed it in 2005.

The Plaintiffs take the view that, if the Corps had looked critically at the assumptions that the County was feeding to it, the Corps would have recognized that, using only the Lee Davis Alternative, the County's multi-million dollar project would not achieve the objective that the County seeks to achieve by building it. And, because the record does not reveal the existence of any additional sewage flow in the area to be served by the Lee Davis Alternative, any additional off-loading necessarily would arrive at the WWTP through other sewer lines—lines that the County did not disclose in its application. Moreover, the Plaintiffs submit, the record also reveals a good deal of information about where and when such other sewer lines likely will be built. And, in their view, the Corps ignored it all.[43]

---

**42.** The calculations that led to those results were undertaken in the following manner: (1) the flow amount that the County predicts would be off-loaded, in 2003, by operation of the Lee Davis Alternative (A.R., at 452) was multiplied by the 1.142 peaking factor, and the result was subtracted from the County's anticipated total (*i.e.*, base) wastewater flow for that year (A.R., at 1411); (2) for each successive year, the total amount of sewage that was calculated to be off-loaded to the WWTP during the prior year (before that total was multiplied by the peaking factor) was multiplied by the anticipated 4% annual

growth rate, and the resulting figure then was "peaked" pursuant to the 1.142 factor; (3) then, that "peaked" flow amount was subtracted from the County's estimated base sewage flow for the particular year under consideration (A.R., at 1411). The final figures have been rounded to two decimal places.

**43.** The Plaintiffs suggest that the Corps erroneously focused its attention on the putative flow *capacity* of the Lee–Davis Alternative instead of on the amount of wastewater that, *in reality*, would be available for conveyance (*i.e.*, off-loading) through that conduit. The

In the Plaintiffs' view, the record reveals that the County has evaluated only two other means for diverting wastewater from Henrico to the WWTP—first, construction of the TC Interceptor, and, second, construction of another component that the parties have referred to as the "Lower Chickahominy Gravity Sewer" (hereinafter referred to as the "LC Sewer").[44] According to the Plaintiffs, the County must build and operate at least one of those additional sewer lines in the near future in order to achieve its goal of meaningfully reducing the amount of wastewater that it treats pursuant to its contract with Henrico.

The Plaintiffs also posit that the record quite clearly supports their position that the County actively is engaged in planning to construct the TC Interceptor (or, at least, a substantial portion thereof). Specifically, they argue that the Corps was obligated, but that it failed, fully to consider (as an activity that is "reasonably relat-

ed" to the activities that the County desires to undertake) the sewer line that The Hanover Group seeks to build (in order to serve the residents of its planned development, "Bell Creek") along 2200 feet of the route that originally was intended for the TC Interceptor. They argue that, although nominally it is part of a private developer's project, that sewer line, in fact, is part of the County's public sewage system and is a portion of what was to be, and likely would become, the very TC Interceptor that the County claims to have abandoned.

In support of that argument, the Plaintiffs point to the following facts of record: (1) the County has agreed partially to finance (through a mechanism known as "oversize credits") the construction costs of the 2200 linear feet of sewer line that would serve The Hanover Group's "Bell Creek" development; (2) that sewer line

---

pre-trial brief of the Corps certainly reflects that the Corps' attorneys relied on the capacity-based figures. *See* June 17, 2002, Defendant Army Corps of Engineers' Merits Brief and Brief in Response to Plaintiffs' Pre–Hearing Memorandum, at 16. With respect to the Corps' own consideration of the issue, however, the record simply is silent. *See infra*.

But, the Plaintiffs argue, it is patently unrealistic to assume that the amount of flow that the Lee Davis Alternative would off-load to the WWTP would be equivalent, or even close to, the amount that it *could* (*i.e.*, at full capacity) off-load. That conclusion is bolstered, they posit, by the following facts: (1) there is no evidence to suggest that development in the County will occur at a faster rate within the area that the Lee Davis Alternative would serve than elsewhere throughout the SSA—that is, at an estimated rate of approximately 4% per year; and (2) the area that the Lee Davis Alternative would serve constitutes approximately 3100 acres, or less than five square miles, of the County's SSA. A.R., at 451.

44. As reflected on the County's Water and Wastewater Facilities Master Plan map (the

"Master Plan map"), the LC Sewer would serve the southeastern portion of the County's SSA and could convey wastewater to either the proposed WWTP or to Henrico County. A.R., at 1643. That map also depicts another sewer line, slated for operation in 2006, which the County explains is the Powhite Creek forcemain. Transc., at 140–42. The LC Sewer and the Powhite Creek forcemain run parallel to each other on the Master Plan map, and both connect the Powhite Creek Pump Station, which the Corps determined might be built as early as 2007, to the Beaver-dam Creek pump station (which is the point from which the County currently pumps sewage to Henrico). Considering that the primary goal of the County's project is to off-load sewage *away* from Henrico, it is logical to assume that the LC Sewer and/or Powhite Creek Pump Station would serve that purpose—that is, that they would collect sewage for conveyance to the Powhite Creek Pump Station, which then would pump that sewage (through some other sewer line) to the WWTP. In that final regard, the Master Plan map depicts a long sewer line running north through the SSA from the Powhite Creek Pump Station up to the WWTP.

will follow the precise route, and will utilize the same easements, that the County would have been used if it had been permitted to construct the TC Interceptor; (3) the County admits that, if the WWTP is completed and becomes operational, sewage from the "Bell Creek" development will be diverted there (via the Shelton Pointe pump station, which presently conveys wastewater to Henrico County); and (4) the sewer is to be constructed in accordance with the County's specifications, and, after it is complete, will be dedicated as a "public sewer main." In light of those facts, the Plaintiffs contend that construction of The Hanover Group's sewer line realistically must be viewed as part of the County's sewer system improvements (i.e., as part of the County's project).

As for the LC Sewer, the Plaintiffs contend that it is the only other option (i.e., besides the TC Interceptor) identified in the record for off-loading wastewater from Henrico County to the proposed WWTP.[45] And, the Corps found that the County intended to begin construction of the [Powhite Creek] Pump Station that would connect with the LC Sewer as early as 2007.[46] A.R., at 6; 2657; 2715. In their view, then, the Corps also was obligated to consider whether construction of the LC Sewer is an activity that is "reasonably related" to those for which the County sought the Corps' approval in its JPA.

With the Plaintiffs' arguments in mind, therefore, it is appropriate to ascertain whether the record supports the Corps' determination that the County's November 16 JPA satisfied the "reasonably related" requirement of 33 C.F.R. § 325.1(d)(2).

### (3) Review Of The Agency's Determination

#### (i) Is The Lee Davis Alternative Sufficient?

▮▮ Throughout the course of both *Crutchfield* I and this case, the County has, at every opportunity, emphasized both its imminent need for additional wastewater treatment capacity and the dire circumstances with which it will be faced if it does not obtain that increased capacity. And, anyone who is even remotely familiar with the parties' dispute would agree that, all along, the County has desired to secure its much-needed wastewater treatment capacity through reliance on a combination of treatment facilities—most notably, those in Henrico County, those that the County

---

45. The Plaintiffs suggest that the LC Sewer would operate in the following manner:
 The [LC Sewer] would collect and off-load sewage from the Beaverdam Creek pump station [which is located in the Southeastern portion of the SSA] (the point where the County pumps sewage to Henrico County) and deliver it via a gravity sewer paralleling the Chickahominy River to a to-be-constructed Powhite Creek Pump Station ... some 3.7 miles downstream. A.R.[, at] 1643. From this new pump station, the sewage would be pumped through a forcemain ... to the proposed [WWTP].
 June 3, 2001, Plaintiffs' Pre–Hearing Memorandum, at 20. As discussed above, however, the County's Master Plan map also depicts the Powhite Creek forcemain as a potential means for conveying wastewater to the Pow-

hite Creek Pump Station (and, through it, to the WWTP).

46. At oral argument, it appeared that there is some confusion as to whether the County's plans to construct the Powhite Creek Pump Station have been accelerated from the 2017 date that appears on its Master Plan map, A.R., at 1643, to 2007 (as the Corps found), or, instead, whether the 2017 estimate is correct. Transc., at 140–41; 157–58; 178–82. In any event, at several places in the record, including in its final decisional document, A.R., at 6, the Corps observed that the County had informed the Corps that "a new pump station for the Powhite Creek basin may be constructed as early as 2007 to pump flow to Henrico or to the new [WWTP]."

now operates in the Doswell, Ashland, and Hanover Courthouse areas of the SSA,[47] and the proposed WWTP that is the core feature of the project at issue. Therefore, it is neither novel, nor irrational, for the Plaintiffs to suggest that, before it determined that the County's JPA was complete, the Corps was obligated fairly and honestly to ascertain whether the proposed project (as described in that JPA) could allow the County to attain the stated goal which the project was intended to achieve. Indeed, that determination would appear to have been a crucial predicate to meaningful consideration of the other fundamental issues that the Corps was called upon to consider. And, the need to assess the credibility of the County's representations as to that point should have taken on even increased significance in perspective of the events leading up to the County's submission of its revised permit application—that is, in perspective of *Crutchfield* I.[48]

The Corps' decisional document, however, reflects that the Corps gave virtually no critical thought to whether the County could achieve its principal objective—offloading enough sewage to allow it to remain within the 5.4 mgd limit of its contract with Henrico—through operation of the project as described in the County's November 16 JPA (*i.e.*, with no additional improvements). The Corps described the "Purpose and Need of the Proposed Work" at the outset of its April 4 MFR. A.R., at 3. After stating that the County expected that it "could exceed [its] allotted sewage flow [limit under its contract with Henrico] as early as the spring of 2003," and that it "will need to provide additional treatment capacity to accommodate [its]

anticipated 3 to 4% growth for the next 7 to 10 years[,]" the Corps discussed the purported solution to that problem—the Lee Davis Alternative. *Id.* The Corps explained that:

> The proposed Lee Davis [Alternative] will replace the previously proposed [TC Interceptor] as the initial source of wastewater supply for the proposed [WWTP] in quantities nearly comparable to the [TC Interceptor]. The reduction in the flow being sent to Henrico County by the construction of the Lee Davis [Alternative] will allow for the continued transfer to Henrico County of sewage flow collected in the Totopotomoy Creek basin. As needed in the future, other wastewater conveyance projects will connect to the [WWTP].

*Id.*

That conclusory remark was not based on, or supported by, a critical assessment of the facts of record respecting whether the project—as presented and without other sewage supply lines—would permit the County to meet its goal. Neither the April 4 MFR, nor any other document included in the administrative record, reflects that the Corps gave any real consideration to the position in which the County would find itself (in terms of approaching or exceeding its limit under its contract with Henrico) if the WWTP were to become operational at .8 mgd and remain at that level (factoring in the anticipated 4% annual growth) for the foreseeable future (*i.e.*, without sewage from elsewhere).

As the Plaintiffs point out, the Corps did not even consider whether the collection and conveyance lines feeding the Lee

---

47. A.R., at 426.

48. It must be remembered that, in *Crutchfield* I, the County's initial, and preferred, plan was stymied based upon the finding that the Corps

had allowed the County improperly to "segment" the components of the project, thereby permitting it to evade the requisite regulatory scrutiny.

Davis forcemain would supply sufficient sewage thereto in order to permit it to operate at any level above approximately .8 mgd. If, as the Plaintiffs assert, there is no additional flow available for conveyance through the Lee Davis forcemain to the WWTP, then .8 mgd is not only the initial flow, but it is also the maximum flow, that will be off-loaded thereby until additional sewer lines are built to divert more sewage to that facility. At that level of off-loading, and in perspective of the anticipated 4% annual growth rate, the County likely would exceed the limit on its contract with Henrico in the near future, perhaps as early as 2005. *See supra* at 626.

As noted, however, the record contains no evidence that the Corps engaged in any calculations of the sort in which the Plaintiffs engaged (when they attempted to demonstrate the shortcomings of the Corps' decision), or in any critical assessment whatsoever of that fundamental issue. Instead, the record contains merely the conclusory assertion that "the Lee Davis [Alternative] will provide wastewater flow to the [WWTP] in quantities nearly comparable to the [TC Interceptor] and will allow Hanover County to remain within its contractual limits of 5.4 mgd of treatment capacity with Henrico County for an additional 7 to 10 years with the anticipated 3 to 4% growth." A.R., at 5–6. Considering that, in *Crutchfield* I, the Corps' decision was found deficient because of the talismanic invocation of both regulatory language and unsupported statements made by the County, its present failure critically to examine this fundamental postulate of the County's position is especially egregious (not to mention arbitrary, capricious, and otherwise not in accord with law).

Indeed, the Corps' conclusion, whether or not correct, simply parrots the positions asserted by the County (and which Ms. Painter repeated in her December 10 and 27, 2001 MFRs) after its December 6, 2001 meeting with the County representatives. A.R., at 2656–57; 2715. That conclusion, of course, is the very basis underlying the Corps' finding that the County's November 16 JPA included all "reasonably related" activities and, therefore, was "complete."

Thus, here, as in *Crutchfield* I, the Corps simply accepted what the County had to say and, as a result, paid no attention at all to whether, in fact, the project (as described in the JPA) would permit the County to off-load enough sewage from Henrico to the WWTP so that it could remain within its contractual limit for seven to ten years. And, as explained above, the Plaintiffs have made a strong showing that precisely the opposite is true—that is to say, the Plaintiffs convincingly have demonstrated that, even if the project that is presented in the County's JPA became fully operational, the County likely would exceed its contractual limit in 2008. And, the record strongly suggests that the contractual threshold may be exceeded as early as 2005.

At oral argument, counsel for the County proffered his own estimates of what impact the project, as presented, likely would have on the County's contractual limit. Counsel arrived at very different conclusions than those that the Plaintiffs reached. Counsel twice led the Court through his own series of calculations, and he concluded that operation of the project would allow the County to off-load enough sewage from Henrico to the WWTP so as to remain safely within its contractual limit for at least ten (and perhaps as many as seventeen) years. Transc., at 146–47; 166–67.

In an effort, to review the record on this issue, and to rid the process of criticisms

levied by the County at the Plaintiffs' calculations, the Court undertook an independent assessment using the County's sewage treatment demand figures and other, undisputed factors. *See supra,* at 624–626. That exercise suggests that the County will exceed its maximum contracted capacity (5.4 mgd) in 2005.

At oral argument, counsel for the County suggested that the Plaintiffs' math is "no better" than the County's. Transc. at 207–08. That may be true. Further, it certainly would be foolhardy to assert that the Court's math is better than that of either party. The fact of the matter is that the subject that is at issue is technical and the calculations in which the parties have engaged require some degree of expertise. That is to say, they are the sort of issues upon which courts are instructed to defer to the agency's findings. Such deference is impossible, however, when the record is completely devoid of findings on the relevant topic, where the agency's decisional document merely restates, verbatim, conclusions that the project proponent supplied to the agency, and where the only calculations presented are those in which the (obviously self-interested) plaintiffs and project proponent have engaged.

Thus, the point is not whether the Plaintiffs, and the County, have done their math correctly; the point is whether the Corps has done it correctly, and, even more directly, whether it has done the math at all (or, in any other way, has examined this fundamental issue). The record in this case reflects that the Corps has not done so. Indeed, at oral argument, counsel for the Corps conceded that, at least "to some extent," the Corps merely "rel[ied] on the

County's representations" respecting the amount of flow that the Lee Davis Alternative would be able to off-load and the consequent effect on the contract with Henrico.[49] Transc., at 98. In perspective of the events that have led the parties to the point at which they now find themselves, and considering the decisions in *Crutchfield* I, the Corps was obligated to do more than that.

The foregoing analytical deficiency, in an area of obviously critical importance, renders the Corps' findings (or lack thereof) arbitrary and capricious. It is well-settled that agency action is "arbitrary and capricious if the agency has ... entirely failed to consider an important aspect of the problem." *Motor Vehicle Mfrs. Assn. of United States, Inc. v. State Farm Mut. Automobile Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 2867, 77 L.Ed.2d 443 (1983), *see also Yousefi v. INS,* 260 F.3d 318, 329 (4th Cir.2001).

### (ii) The Corps' Consideration Of The TC Interceptor

▮ Whereas the record is devoid of any or proof that the Corps considered whether the project, as presented by the County, realistically would off-load enough sewage to the WWTP to relieve the County's impending wastewater treatment crisis, the same is not true of its consideration of the Plaintiffs' assertion that the County still intends to build the TC Interceptor. Rather, and as set forth above, the Corps devoted substantial verbiage in its April 4 MFR to the Plaintiffs' concerns respecting whether, in fact, the County has abandoned its plans to build the TC Inter-

---

49. When pressed, counsel for the Corps simply was unable to point to any document in the voluminous administrative record that evinces independent, critical inquiry into the issues at hand (*i.e.,* the amount of wastewater that the Lee Davis Alternative will be able to off-load and the impact on the County's contract with Henrico thereof) on the part of the Corps. Transc., at 67–114. It suffices to say that the Court has been unable to find any such document either.

ceptor. The Corps also paid some measure of attention to the sewer line for which The Hanover Group has sought a permit in conjunction with its "Bell Creek" project. Closer scrutiny, however, reveals that the Corps rather blindly accepted the County's representations as to several key issues and, again, failed independently and critically to assess those issues.

Both before and after its decision that the November 16 JPA was "complete," the Corps considered whether the County still intended to construct the TC Interceptor as originally planned. It appears that the Corps first became aware of the Plaintiffs' concerns after Ms. Painter read the November 29 brief that they had filed in *Crutchfield* I. Thereafter, in his December 7, 2001 letter to Ms. Painter, counsel for the Plaintiffs suggested that the Corps needed seriously to consider that issue by asserting that "[t]he most obvious activity excluded from the [County's] application is the County's plans for construction of the [TC Interceptor]." A.R., at 2156.

The Corps then sought information respecting the TC Interceptor during its December 6 meeting with representatives from the County. As discussed above, that meeting is the subject of two separate MFRs in which Ms. Painter reports certain statements that the County's representatives had made concerning the TC Interceptor. *See supra;* A.R., at 2656–57; 2714–16. Even a cursory review of the Corps decision that the County's JPA was "complete" reveals that those statements, proffered by the County, and accepted as fact by the Corps, are the sole basis upon which the Corps rested that crucial finding. That is borne out by the fact that precisely the same language and reasoning (and no other) appears at the relevant pages of Ms. Painter's two December MFRs as appears in the final, April 4 MFR that is under review. The Corps

simply repeated what the County had told it and, without any citation of support in the record, and without any additional explication as to the logic, or the merit, of the County's assertions, accepted each one of those assertions as true.

Again, in view of everything that had transpired in *Crutchfield* I, and faced with substantive objections on the part of the Plaintiffs (whose objections to the original permit proceedings—at issue in *Crutchfield* I—by this time had been proven meritorious), the Corps was obligated to give the issues a hard look. The issue respecting the County's intentions as to, and the status of, the TC Interceptor is linked to the question whether, at .8 mgd, the flow of sewage through the Lee Davis forcemain would permit the County to remain within the Henrico contractual limit because, if that is not the case, then the County would need to convey additional flow through other sewers leading to the WWTP (*i.e.,* to off-load that sewage from Henrico). One obvious alternative is the TC Interceptor, either as originally planned or as modified. Uncritical, unthinking acceptance of the County's statements at the December 6 meeting (and thereafter) led the Corps to believe that the TC Interceptor was no longer part of the picture. The record, however, contains substantial indicia that part of the TC Interceptor, in other garb, presently is being built by The Hanover Group. *See infra.*

What is even more troubling is the fact that, after it made its decision that the JPA was "complete," and after it issued public notice thereof, the Corps had every opportunity to augment, or to amplify, its findings. That is because the Plaintiffs continued to press the Corps on the same issue—that the County was not being fulsome in disclosing its true intentions respecting the TC Interceptor. Indeed, in

his January 25, 2002 letter to the Corps, counsel for the Plaintiffs articulated in great detail the reasons why he believed that the County still planned to build some, or all, of the TC Interceptor. A.R., at 1613–21. Among other things, counsel pointed out that The Hanover Group was seeking to build a substantial portion of sewer pipeline in the exact path of the "abandoned" TC Interceptor, using the County's easements, to the County's specifications, and with a partial reimbursement from the County. *Id.*

It does appear that the Corps at least set about to investigate, and to obtain additional information respecting, that issue (as well as some other issues). Thus, as discussed above, Ms. Painter requested information by way of a January 31, 2002 e-mail, and the County responded to that request by letter dated the following day. A.R., at 1575; 1506–12. Later, on February 11, 2002, the Plaintiffs again stated their contentions respecting The Hanover Group's "Bell Creek" project. A.R., at 2194–98. Accordingly, it appears that the Corps had a good deal of evidence as to some aspects of the Plaintiffs' challenge.

But, as noted, scant mention of The Hanover Group's project appears in the section of the April 4 MFR that articulates the Corps' decision that the County's JPA was "complete." The defendants correctly point out that the Corps did mention the "Bell Creek" project in the "Cumulative Impacts" section of the April 4 MFR.[50] There, the Corps made the following findings, stated in relevant part:

> The Bell[ ] Creek development ... would utilize a portion of the [TC Interceptor] alignment. The developer antic-ipates having houses constructed and occupied by the fall of 2002. The sewer line serving the Bell Creek development would consist of approximately 9,700 linear feet of pipeline from the development to the existing Shelton Pointe pump station that currently pumps to ... Henrico County for treatment. However, sewage from the Bell Creek development will eventually be pumped to [the WWTP], if it is approved and constructed.... *[A]pproximately 2,200 feet of 30–inch sewer line would be constructed along the same ... alignment that the [TC Interceptor] would have followed. The current application proposes a permanent loss of 2.09 acres of wetlands[.]* The review of this project and its impacts has not yet been completed. While this portion of the Bell Creek sewer line is proposed to occupy the original sewer easement obtained by Hanover County for the [TC Interceptor], [it] will be a 30–inch line capable of carrying approximately 4.8 mgd of flow. The [TC Interceptor] would have been a 42–inch line with a flow capacity of 12 mgd. The Bell Creek sewer line is sized to serve The Hanover Group's development and would not serve the same function as the originally proposed [TC Interceptor].... Hanover County has stated that [it has] no plans to construct any portion of the [TC Interceptor][.]

A.R., at 19–20 (emphasis supplied).

The record reflects that the Corps was well aware of The Hanover Group's contractual relationship with the County. For example, the record includes a Statement of Proffers that was drafted in connection with the re-zoning of County land for the

---

50. In addition, in the section of that MFR entitled "Findings and Decision of the District Engineer," the Corps explained that "[t]he proposed work by others along a portion of the original [TC Interceptor] alignment is not reasonably related to [the County's] project and will be evaluated by the Corps as a part of The Hanover Group's application for a multi-use development." A.R., at 38.

"Bell Creek" project. A.R., at 1656. Section 10 of that Statement of Proffers, entitled "Extension of Utilities," includes the following language:

> The Applicant shall *design and construct a public sewer main* from the confluence of the Totopotomoy and Strawhorn Creeks to the north west corner of [the] property. Subject to standard County policies regarding oversizing credits, the Applicant *shall size such main to accommodate development of adjacent properties as may be determined by the Director of Public Utilities.* Further, in the event that a sewer main has not been extended from the aforesaid confluence eastward to the Shelton Pointe Pump Station at the time of such construction, the Applicant shall construct such sewer extension, and *shall be entitled to credit therefor* in accordance with policies established for such extensions.

*Id.* (emphases supplied). Moreover, the Plaintiffs fully had apprised the Corps of the facts that The Hanover Group's sewer was to be built (1) in exactly the same path in which the TC Interceptor would have been built, and using the easements that the County obtained when it intended to build the TC Interceptor; (2) to the County's own specifications; (3) for the purpose of conveying wastewater from the "Bell Creek" development to the County's

WWTP, if that treatment plant was built; and (4) in part, with a reimbursement from the County in the form of oversize credits.[51] Finally, when completed, the sewer would be a public sewer owned by the County.

Remarkably, the Corps' decisional document contains no reasoned analysis of those realities. To the contrary, and as noted above, the Corps failed critically to assess The Hanover Group's project when deciding whether the sewer line contemplated by that developer is "reasonably related" to the County's project. Moreover, when the Corps did consider the "Bell Creek" project, it concluded that, because the sewer that would serve that development was to be made of 30–inch pipeline, rather than the 42–inch pipeline out of which the TC Interceptor would have been wrought, the two sewers would not serve the same function. It was on that frail basis, as well as upon the County's representations that it has no plans to construct the TC Interceptor, that the Corps disposed of that aspect of the Plaintiffs' challenge.

That conclusion cannot be considered the product of sound reasoning. In fact, it cannot even be viewed as a genuine attempt to assess what were, and are, undisputed facts of record that demand serious attention. The inexplicable absence from the "reasonably related" section of the

---

**51.** At oral argument, counsel for the County explained the nature and purpose of oversize credits. Without going into exhaustive detail on that topic, oversize credits are reimbursements paid by the County to private developers who desire to take advantage of the County's extant utilities infrastructure. When a developer seeks to connect his project to the County's public sewer system, the County charges that developer a connection fee. An oversize credit is an allocation of the cost of building materials actually used (by such a developer), which the County credits against the developer's connection fee. No cash

changes hands, per se. Oversize credits are awarded when developers connect to the public utility system by constructing a connection (*i.e.*, a sewer pipe) that is larger than that which the developer itself would need. Thus, the system of oversize credits serves to partially reimburse developers for adding components to the public utility system that the County, or other developers, later may utilize. The County asserts that this system, authorized in its ordinances, reflects and facilitates efficient and orderly governmental planning. Transc., at 133–37.

Corps' April 4 MFR of any meaningful discussion respecting The Hanover Group's sewer project appears especially stark in light of the fact that the Plaintiffs consistently pressed the Corps on that issue. And, in light of all the evidence that the Plaintiffs proffered (demonstrating that The Hanover Group's sewer is, indeed, very "related" to the County's TC Interceptor), the Corps' bare conclusion that those two sewer lines "would not serve the same function" is too simplistic to pass muster under even the most deferential review.

In truth, the two sewer lines would serve precisely the same function—that is, conveying wastewater from the Totopotomoy Creek basin to the WWTP—only they would do so in different amounts and one—the "Bell Creek" sewer—would traverse substantially less ground. The fact that the pipe out of which The Hanover Group's sewer would be built is smaller than that out of which the TC Interceptor would have been constructed is insufficient to permit the Corps to find that those two patently similar projects were not "reasonably related." That is especially true where, as explained, the Plaintiffs had urged the Corps to look at the bigger picture—i.e., to realize that, even though it nominally is a "private developer's project," The Hanover Group's sewer, practically speaking, is part of the County's own wastewater treatment system. Faced, as it was, with the aforementioned facts and with the Plaintiffs' arguments, the Corps certainly should have taken a long, hard look at that issue. Its conclusory assertion at page 38 of the April 4 MFR that "[t]he proposed work by others along a portion of the original [TC Interceptor] alignment is not reasonably related to [the County's] project[,]" is patently insufficient.

### (iii) Did The Corps Properly Consider The Plaintiffs' Concerns Respecting The LC Sewer?

 Similarly, the Corps simply glossed over, and then echoed, the County's statement that a new pump station in the Powhite Creek basin might be built as early as 2007. The record is devoid of any indication that the Corps was concerned with, or undertook any critical analysis of, the significance of that fact. That omission is particularly glaring because the County's Master Plan map indicates that the project known as the "Powhite Creek Pump Station", which would be constructed near the southeastern boundary of the SSA, was not scheduled to be constructed until 2017, ten years later than the date referred to in the April 4 MFR. Moreover, the decision on the merits in *Crutchfield* I expressly recognized the "undisputed fact[ ]" that "the Powhite Creek Pump Station interceptor line is not scheduled to go online until 2017, if then." *Crutchfield*, 154 F.Supp.2d at 896. Against that backdrop, it is remarkable that the Corps, confronted with a defined aspect of the County's long-term wastewater treatment plan that, now, appears to have been accelerated by ten years, did not inquire into the timing and impacts of that project.

Another fact of significance to which the Corps paid no heed is that a pump station is of no utility standing alone. Its value exists in forcing sewage from one point to another. Thus, obviously, sewage must be conveyed to the pump station and then away from it. It is not unreasonable to expect the Corps, with its expertise, to have understood that fact.

If, however, the Corps grasped the significance of the fact that a new pump station was to be built by 2007, not to mention the fact that its construction had been advanced by 10 years, the April 4 MFR does not disclose any such aware-

ness. A reasonably alert agency would have probed into where the sewer lines would be located en route to that pump station and how, if at all, the pumped sewage would be conveyed to the WWTP. Moreover, given that the pump station was to be built by 2007, one would have expected the Corps to inquire whether a Corps permit would be required for such a project and (if it were likely that a permit would be required) when, in the five years between now and 2007, an application therefor might be filed. And, it would not have been untoward of the agency to ask whether the designs for that pump station had been started or were complete.

But the Corps did not ask questions of that ilk, or otherwise inquire into the matter. Instead, it simply accepted the County's statements, "cut and pasted" them into its decisional document, and declared that the November 16 JPA included in it "[a]ll activities which the applicant plans to undertake which are reasonably related to the same project and for which a DA permit would be required[.]" *See* 33 C.F.R. § 325.1(d)(2).

That conclusion entirely ignores the Powhite Creek Pump Station itself, the means through which sewage would be conveyed to and from it, and the location to which it would convey sewage. As noted above, the record reflects that the County has conceived several possible conduits that it might connect to the Powhite Creek Pump Station. A.R., at 1643. The first of those is a forcemain through which sewage could be off-loaded from Henrico, to the Powhite Creek Pump Station, and, ultimately, north to the WWTP. The record indicates that the construction of that forcemain might take place as early as 2006. *Id.* At oral argument, however,

counsel for the County asserted that there is "nothing in the record that indicates that this force main, which can be built right by the road or in the right of way of the public roads, would have any environmental impacts." Transc., at 141. That may be true, but it was up to the Corps to ascertain whether wetlands impacts were possible and then, if appropriate, to conclude that none would occur. So far as the record discloses, the Corps made no inquiry into that issue.

Another conduit that appears in the record is the LC Sewer, which, it seems, would operate in much the same manner as the forcemain described above. The record discloses a strong likelihood that construction of the LC Sewer would engender substantial wetlands impacts because, for most of its extended length, that sewer would lie very near the banks of the Chickahominy River.[52] And, although the County and the Corps correctly note that the record generally is undeveloped on that issue, neither defendant disputes the Plaintiffs' basic point—*i.e.*, that construction of the LC Sewer, if and when it does occur, would result in significant wetlands impact. Finally, other conduits appear on the County's Master Plan map and, although it is unclear precisely how such conduits would operate, or what purposes they might serve, they clearly are contemplated to connect to the Powhite Creek Pump Station.

The Corps engaged in no discussion of those various conduits, let alone articulate any findings with respect thereto. It stated, quite simply, that "a new pump station for the Powhite Creek basin may be constructed as early as 2007 to pump flow to Henrico or to the [WWTP] in order to

---

**52.** The County's Master Plan map reflects that the LC Sewer would consist of roughly 18,000 linear feet of 36–inch sewer line which, at several points, would cross over (or abut) various streams and tributaries.

offload more flow from Henrico[.]" A.R., at 6. Later, when discussing "Other Options to Handle Sewage in the Future," the Corps articulated the same statement and noted that sewage collected from the Powhite Creek basin "would initially be pumped to Henrico County." A.R., at 23. Having acknowledged that the County's plans included construction of the Powhite Creek Pump Station in 2007 (ten years earlier than was the case when the Corps considered the project in 2000), the Corps ignored several basic questions, including: (1) how was the sewage to get to the Powhite Creek Pump Station; (2) how would it be conveyed to the WWTP (or to Henrico); and (3) what, if any, wetlands would be affected by building those sewage conduits. And, fully aware of the length of time necessary to design, to obtain rights of way and permits for, and to construct sewage lines, the Corps did not even ascertain when the County would need to initiate those types of activities if (as the Corps found) the Powhite Creek Pump Station was to be constructed as early as 2007.

The Corps' silence is especially stark given that it acknowledged, at a minimum, the possibility that the role of the Powhite Creek Pump Station would be to offload sewage from Henrico and to the WWTP.[53] Therefore, just like The Hanover Group's "Bell Creek" sewer project, the Powhite Creek forcemain, and the LC Sewer, though they may be constructed at various times in the future, are mechanisms that will enable the County to achieve the precise goals that it has set for its *current* project. The Corps was obligated to give that serious attention in assessing whether the County had disclosed all activities rea-

sonably related to the project presented in the November 16 JPA. But, as noted, the Corps failed to do so.

### (iv) Summary

The County and the Corps seem to advance the view that all of the aforementioned failures are insignificant technicalities because the Corps ultimately issued NWPs, which do not require the "reasonably related" and "completeness" findings mandated by 33 C.F.R. § 325.1(d)(2). As stated above, that reasoning ignores reality and cannot be embraced.

The purpose of § 325.1(d)(2) is to assure that, before the Corps makes any decision respecting an application for an individual permit—including whether to convert that application into a request for verification of NWPs—the Corps is aware of all possible wetlands impacts. That awareness is perhaps most important when the Corps actively is considering whether to allow the application to proceed as an NWP verification request, free from the stringent environmental review called for by the regulatory scheme applicable to individual permits.

The criteria to be applied in that circumstance is whether the wetland impacts that the project would cause would be greater than "minimal." If not, then an NWP can be considered. If so, then the individual permit process must go forward. It is impossible for the Corps to make a defensible finding on that issue unless and until it examines all activities that are "reasonably related" to the project.

The Corps is obligated carefully to scrutinize an application, and its associated

---

**53.** Indeed, and as noted above, in perspective of the County's expressed goal of offloading sewage *away from* Henrico and to the WWTP, it is highly unlikely that the County would employ the Powhite Creek Pump Station to send the sewage collected in the Powhite Creek basin *to* Henrico County. To do so would be to exacerbate the strain that the County is experiencing under its contract, and that would run directly contrary to its goals.

documents, for obvious indicia that the applicant may have not disclosed such activities. And, at least where, as here, an interested party has pointed to several such indicia, the Corps is not entitled merely to rely on what the applicant says in response. Rather, the Corps is required to use its expertise to examine the record and to pay close attention to details and data therein that contradict, call into question, or confirm, the applicant's responses. Then, the Corps must articulate its reasons, not in conclusory terms, but in a sensible fashion that is firmly grounded in the facts of record. That is especially appropriate when, as here, the Corps' previous decision has been found wanting on account of its uncritical acceptance of the applicant's representations and its conclusory, but illogical, reasoning.

In sum, and for all of the reasons stated above, the Corps' decision that the County's November 16 JPA disclosed "[a]ll activities which the applicant plants to undertake which are reasonably related to the same project and for which a [Corps] permit would be required" was arbitrary, capricious and otherwise not in accordance with law. As a result, the Corps' decision that the County's JPA was "complete," which depends for its validity on the "reasonably related" finding, also is legally deficient.

### 2. The Corps' Unexpected Decision To Verify That The County Could Proceed Pursuant To The Authority Of NWPs

The second basis upon which the Plaintiffs attack the Corps' decision is that, having represented that it would process the County's revised JPA under the regulations applicable to individual permits, and having actually set about to proceed in that manner, the Corps' unexpected decision to verify that the County could proceed under the NWP program was not in accordance with law. Again, the Plaintiffs are correct.

### a. A Review Of The Facts

A brief review of the facts is in order before turning to the parties' arguments respecting whether, having largely completed its public interest review of the County's project under the regulatory scheme applicable to individual permits, the Corps was authorized to change course and verify that the County could proceed under NWPs. The first salient fact is that, on September 25 and October 2, 2001, the Corps informed the County and the Court, respectively, that it had decided to "address all components of the project in a single permitting action and [to] do so in the context of an application for an individual permit rather than a request for an NWP authorization." [54] The context in which the Corps reached that decision, of course, included this Court's August 14 opinion setting aside the Corps' previous permitting decision and remanding the matter to the agency for further proceedings. It also included an upcoming hearing respecting the Plaintiffs' motion for injunctive relief pending remand. The Corps explained that its decision was based "on a number of factors, including a reevaluation of the permitting procedures that would be most appropriate in light of the Court's decision." At the pre-application meeting on November 9, the Corps directed the County to submit an individual permit application. And, as acknowledged at oral argument by counsel for the County, in presenting its application, the County desired to proceed in accord with the Corps' decision to treat the November

---

54. *See supra,* note 9.

16 JPA as one seeking an individual permit. Transc., at 120–21.

The next important fact is that, on November 16, shortly after entry of the permanent injunction in *Crutchfield* I (prohibiting the County from working on its project while the matter was on remand), the County submitted its revised permit application. The project described in that application was different in one significant respect than the project that the Corps originally had considered (*i.e.,* the County had replaced the TC Interceptor with the Lee Davis Alternative). That application (unlike the one for which the Corps verified the NWPs that were at issue in *Crutchfield* I) was not accompanied by a cover letter requesting that the Corps "verify" (a term of art in the Corps' permitting vernacular) that the County could proceed under the authority of NWPs. To the contrary, it appears generally to have been understood that, initially, the Corps intended to process the County's November 16 JPA as an application seeking individual permits.

As a harbinger of things to come, also on November 16, the Corps' District Engineer, Colonel Hansen, mailed a letter to two federal legislators in which he disclosed a position of which neither the Plaintiffs nor the public were made aware. Colonel Hansen told those legislators, although "[p]reliminary information received at a pre-application meeting with the County . . . indicates that the wetland impacts of these activities may indeed be minimal and [that] the project may qualify for Nationwide permits[,] . . . the District's decision to assert discretionary authority in light of the recent litigation, is based on the need to evaluate all segments of the project, as well as alternatives to the pro-

ject, as a whole." A.R., at 2404. Thus, the record reflects that, even at that early stage (*i.e.,* before the County even had submitted its revised JPA), and notwithstanding its representations to the Plaintiffs and to the Court, the Corps seriously was considering whether the County could proceed under the authority of NWPs.[55]

Nonetheless, the Corps proceeded to undertake its evaluation of the County's JPA in accordance with the regulations applicable to individual permits. *See supra.* It decided that the application satisfied the "reasonably related" requirement set forth at 33 C.F.R. § 325.1(d)(2), issued public notice, received public comment, represented to interested parties that the County's project was under review for an individual permit, and solicited the input of various other administrative agencies. None of that would have been necessary, or appropriate, if, all the while, the Corps had been convinced that the project qualified for NWPs.

Then came the December 14, 2001 field visit, after which Ms. Painter concluded that "the magnitude of the proposed and completed impacts to wetlands and waters of the U.S. are minimal and could be authorized by general permits." A.R., at 2677. Neither the Plaintiffs nor the Court were informed of that conclusion, which, as noted, was "preliminary" and "contingent" upon the receipt of information and input from various other sources.

The record indicates that, over the next few months, while the Corps (internally) was actively considering the possibility of verifying that the County could proceed under the NWP program, the Plaintiffs were submitting their comments and operating under the justifiable assumption that

---

**55.** That kind of duplicity is unacceptable and, in this case, it (along with the agency's conduct as described in *Crutchfield* I) is one of the reasons that the Court has reviewed the conclusory assertions in the Corps' April 4 MFR with an increased level of scrutiny.

the Corps was still evaluating the JPA under the individual permit program. A January 29, 2002 internal e-mail discusses "[t]he Colonel's [*i.e.,* the District Engineer's] desire ... that if the project qualifies for a NW then it should be authorized as such[,]" and reveals that the Corps plan was to "go ahead and complete the environmental and public interest review ... [and] use the results of the analyses to document that either the project has only minimal impacts ... or show that the impacts are more than minimal." A.R., at 2854.

Finally, after completing its public interest review (as planned), the Corps issued its April 4 MFR, in which, of course, it concluded that the County could proceed under the authority of four NWPs. The April 4 MFR contains scant discussion of the process, or authority, by which the Corps had shifted from the individual, and to the Nationwide, permitting regimes. The sole justification that the Corps cited in support of that shift is 33 C.F.R. § 330.4(e)(3). The Corps explained that:

> Based on the results of the [December 14, 2001] field evaluation, the elimination of the [TC Interceptor] as a component of the project, and the fact that no new issues were identified in response to the Public Notice or subsequent coordination with appropriate State and federal resource agencies that would preclude the use of general permits, the District Engineer determined that it was appropriate to consider the project under the Nationwide Permit program.

A.R., at 38. Having considered the project under the NWP program, the Corps then determined that it qualified for authorization under a combination of NWPs.

With that time-line in mind, it is appropriate to consider the regulation that the Corps relied upon to support, and the parties' arguments respecting, the switch from the individual permit mode to the NWP mode.

### b. The Authority Cited By The Corps For Shifting Procedures

According to the April 4 MFR, the Corps relied on 33 C.F.R. § 330.4(e)(3) as the authority pursuant to which it could abandon the individual permit procedure, upon which it had insisted since September 25, 2001, and in which it had been engaged since November 16, 2001, and shift to the NWP procedures. That regulation, which is found in the Corps' rules respecting the Nationwide Permit Program (33 C.F.R. Part 330) provides:

> The Corps reserves the right (i.e., discretion) to modify, suspend, or revoke NWP authorizations. Modification means the imposition of additional or revised terms or conditions on the authorization. Suspension means the temporary cancellation of the authorization while a decision is made to either modify, revoke, or reinstate the authorization. Revocation means the cancellation of the authorization. The procedures for modifying, suspending, or revoking NWP authorizations are detailed in § 330.5.
>
> (3) The division or district engineer will restore authorization under the NWPs at any time he determines that his reason for asserting discretionary authority has been satisfied by a condition, project modification, or new information.

As defined at 33 C.F.R. § 330.2(g), "[d]iscretionary authority means the authority described in §§ 330.1(d) and 330.4(e) which the Chief of Engineers delegates to division or district engineers to modify an NWP authorization by adding conditions, to suspend an NWP authorization, or to revoke an NWP authorization and thus require individual permit authorization."

33 C.F.R. § 330.1(d) expands on that definition. It states:

Discretionary authority. District and division engineers have been delegated a discretionary authority to suspend, modify, or revoke authorizations under an NWP. This discretionary authority may be used by district and division engineers only to further condition or restrict the applicability of an NWP for cases where they have concerns for the aquatic environment under the Clean Water Act section 404(b)(1) Guidelines or for any factor of the public interest.

The concept of discretionary authority, as created and defined by those regulations, affords the Corps a substantial degree of flexibility in managing the NWP program. The question here, however, is whether that concept, and, in particular, section 330.4(e)(3), authorized the Corps to do what it did here—that is, to abandon the individual permit process and shift to the NWP regime.

### (1) The Parties' Arguments

The Plaintiffs argue that the concept of discretionary authority is inapplicable in this case because "(1) the district engineer did not receive a NWP verification request for [the County's] project in the first place; (2) the district engineer never exercised discretionary authority to convert a NWP verification request into an individual permit application; and (3) it therefore was not possible to "restore" authorization under the NWPs." June 3, 2002, Plaintiffs' Pre–Hearing Memorandum, at 32. In the Plaintiffs' opinion, the process by which the Corps undertook its review of the County's November 16 JPA—treating the JPA as an application for individual permits, engaging in a four month-long public interest review, and then suddenly announcing that the project could proceed under NWPs—reflects a deliberate effort to evade proper regulatory review.

Specifically, the Plaintiffs contend that the very reason why the Corps suddenly shifted gears, after having completed all, or nearly all, of the aspects of its individual permit review, was because it had become clear that the County's project could not qualify for individual permits. They point to their counsel's January 25, 2002 letter, in which he emphasized that, if the County truly had abandoned its plans to build the TC Interceptor, "then the permit must be denied because the location of the [WWTP] and the influent pump station do not satisfy the Section 404(b)(1) guidelines." A.R., at 1614. The replacement of the TC Interceptor with the Lee Davis Alternative, counsel argued, meant that the WWTP and IPS would no longer need to receive sewage by force of gravity from the Totopotomoy Creek watershed, but, instead, "could receive pumped sewage from other areas[,]" and, as such, "could be located on uplands [as opposed to wetlands] virtually anywhere in the area." *Id.* It is the Plaintiffs' position that the Corps' unexpected shift to the use of NWPs reflects the Corps' recognition that, in fact, a decision granting individual permits would be indefensible.

Counsel for the Corps has characterized the Corps' actions in the following terms:

As an initial matter, the Corps exercised its discretionary authority to revoke the authority of the applicable NWPs for the [TC Interceptor] when the County still intended to construct [it]. Then, when the Corps required the County to combine the [TC Interceptor] with the [WWTP], forcemain and outfall into a single project for permitting purposes after this Court's August 14[, 2001] ruling, the Corps also required the County to do this in the context of an application for an individual permit. This action

effectively extended the Corps' assertion of discretionary authority from the [TC Interceptor] alone to the entire project. Subsequently, when the County submitted an application for the revised project (dropping the [TC Interceptor] and adding the Lee Davis [Alternative]), the Corps continued to require the County to comply with the requirements applicable to... individual permits. As a result, when the Corps invoked 33 C.F.R. § 330.4(e)(3) ... it was restoring the applicability of the NWPs and revoking the assertion of its discretionary authority[.]

June 17, 2002, Defendant Army Corps of Engineers' Merits Brief and Brief in Response to Plaintiffs' Pre–Hearing Memorandum, at 21–22 ("Corps' Br. at ____").[56]

In the April 4 MFR, however, the Corps did not espouse its approach to reviewing the County's JPA with the same clarity as is stated above. There, as noted, the Corps merely stated that the results of its review evinced that the County's project had minimal environmental impacts and that, as a result, the Corps was invoking 33 C.F.R. § 330.4(e)(3) to "restore authorization" under the applicable NWPs.

## (2) Analysis Of The Corps' Decision To Shift Processes

■ The Corps' reliance on § 330.4(e)(3) is misplaced. The clear terms of the discretionary authority regulations indicate that discretionary authority is a "right (*i.e.*, discretion) to modify, suspend or revoke NWP authorizations." That language reflects that the right that has been reserved presupposes, and requires, an extant authorization. Indeed, the very regulation under which the Corps' purports to have acted in this case speaks

in terms of "restoring" an authorization under the NWPs. Given its usual construction, the word "restore" means "to give back (as something ... taken away); to put or bring back (as into existence or use); and to bring back to or put back into a former or original state." *Webster's Third New International Dictionary*, at 1936 (1986). Thus, the exercise of discretionary authority to "restore" an authorization under an NWP requires that the County had some NWP authorization that could be restored.

The record demonstrates that, in this case, there was no extant authorization that could be restored. As discussed in *Crutchfield* I, there are two kinds of NWP authorizations. The first kind of NWP authorization is available for use merely by qualifying pursuant to the terms of the published NWP. The second kind, however, is available for use only if, after having received a request from an applicant, the Corps issues a verification for use of an NWP. *Crutchfield* I, 154 F.Supp.2d at 894. As the Corps acknowledges in its brief, the NWPs at issue in this case are ones that require Corps verification (*i.e.*, confirmation that the activities sought to be undertaken comply with the terms and conditions of the NWPs sought to be used). *See* Corps. Br. at 7.

The NWPs that were invalidated in *Crutchfield* I could not have been "restored," here, because they related to a different project. The Corps acknowledges that obvious truth and concedes that it did not even purport to do that. *See* Corps Br. at 23. And, after *Crutchfield* I, there simply was no other NWP authorization that could have been "restored" by the April 4 MFR. The Corps tries to avoid this

---

56. Although it has not entirely ignored 33 C.F.R. § 330.4(e)(3), the County has focused most of its attention respecting the Corps'

shift from the individual permit mode to the NWP mode on a different regulation (33 C.F.R. § 330.1(f)). *See infra.*

rather obvious result by positing that it "simply restored the potential applicability of the relevant NWPs to the project." Corps Br. at 23. That assertion, however, is at odds with the NWP permitting scheme and with the Corps' own admission that, before the County could proceed with the project under review in this case, it needed to request verifications of NWPs, which must be approved (affirmatively) by the Corps. The County having made no such request, and the Corps having given no such verifications, there was nothing to "restore." Therefore, the Corps' citation to § 330.4(e)(3) is of no force and effect.

### c. The Authority Cited By Counsel For Shifting Procedures

■■■ That, however, does not end the inquiry because, during the briefing on the merits of the Plaintiffs' case, the lawyers for the County and the Corps proffered another regulation (which the Corps, itself, did not cite in its April 4 MFR)—33 C.F.R. § 330.1(f)—as authority that allowed the Corps to do what it did here. That regulation provides:

*Individual Applications.* DEs should review all incoming applications for individual permits for possible eligibility under regional general permits or NWPs. If the activity complies with the terms and conditions of one or more NWP, he should verify the authorization and so notify the applicant. If the DE determines that the activity could comply after reasonable project modifications and/or activity-specific conditions, he should notify the applicant of such modifications and conditions. If such modifications and conditions are accepted by the applicant, verbally or in writing, the DE will verify the authorization with the modifications and conditions in accordance with 33 CFR § 330.6(a). However, the DE will proceed with processing the application as an individual permit

and take the appropriate action within 15 calendar days of receipt, in accordance with 33 CFR 325.2(a)(2), unless the applicant indicates that he will accept the modifications or conditions.

The short answer to the question whether the defendants may take refuge in 33 C.F.R. § 330.1(f) is that, as noted, the Corps did not cite to, discuss, or otherwise rely upon, that regulation in the April 4 MFR. That undisputed fact, alone, constitutes sufficient grounds to ignore the argument based upon § 330.1(f). *See e.g., Crutchfield,* 154 F.Supp.2d at 900 (holding that an argument that the Corps did not advance in the first instance was "a classic post-hoc rationalization of counsel which provides no ground for supporting the agency's decision."); *see also S.E.C. v. Chenery Corp.,* 332 U.S. 194, 196, 67 S.Ct. 1575, 1577, 91 L.Ed. 1995 (1947) (emphasizing the "simple but fundamental rule of agency law" that "a reviewing court, in dealing with a determination or judgment which an administrative agency . . . is authorized to make, must judge the propriety of such action solely by the grounds invoked by the agency.").

■■■ Even if the law did permit consideration of a regulation upon which the Corps clearly did not rely, however, and even if it was determined that the Corps had acted in conformance with that regulation, the belated invocation of 33 C.F.R. § 330.1(f) would not justify the course that the Corps followed in this case (*i.e.,* informing the Plaintiffs, the Court, and the public that it was proceeding under the individual permit regime while, at the same time, deciding behind closed doors to take another route). In the context of this case, and remembering the decision in *Crutchfield* I (which emphasized that "the regulated party and the regulator are not the only interested parties in respect of"

its decisions as to the County's project), the Corps owed a duty of full disclosure to all interested parties. *Crutchfield*, 154 F.Supp.2d at 900. Here, that was true whether or not the Corps' regulations expressly require it to inform the public that it is considering whether, or that it had decided that, it would switch from the individual permit mode to the NWP mode.[57]

■ That is because, even absent any express regulatory mandate that the Corps violated when it failed to afford notice of its decision to shift to the NWP mode, a more fundamental principle is at work here. In the context of agency rulemaking, that principle is known as the "logical outgrowth" rule, which recognizes that, "if the final rule deviates too sharply from the [proposed rule as to which the public was apprised], affected parties will be deprived of notice and an opportunity to respond to the proposal." *Small Refiner Lead Phase–Down Task Force v. U.S.E.P.A.*, 705 F.2d 506, 547 (D.C.Cir. 1983) (referred to as *"Small Refiner"*). As noted in the *Small Refiner* decision, "[c]ourts have devised various verbal formulas for the extent to which an agency can make changes in the final rule that were not clearly presaged by the notice of proposed rulemaking[,]" all of which seek to answer "the underlying question of how much notice is enough." *Id.* In *Small Refiner,* the United States Court of Appeals for the District of Columbia Circuit discussed that question in the following terms:

In any particular case, the answer to that question must turn on how well the notice that the agency gave serves the policies underlying the notice requirement. Notice, as we see it, serves three distinct purposes. First, notice improves the quality of agency rulemaking by ensuring that agency regulations will be "tested by exposure to diverse public comment." (citation omitted). Second, notice and the opportunity to be heard are an essential component of "fairness to affected parties." (citations omitted). Third, by giving affected parties an opportunity to develop evidence in the record to support their objections to a rule, notice enhances the quality of judicial review. *See Marathon Oil Co. v. EPA,* 564 F.2d 1253, 1271, n. 54 (9th Cir.1977) ("Such comment is often an invaluable source of information to a reviewing court attempting to evaluate complex statistical and technological decisions."). . . . Against these values, we must balance the public interest in expedition and finality.

*Id.*

The Corps' conduct in this case, whether or not technically permissible under 33 C.F.R. § 330.1(f), undermined the very purposes that its public notice was intended to serve.[58] First, it was unfair (and, in

---

57. Without reaching a definite conclusion on that issue, an initial review of the Corps' regulatory scheme appears to support the position that no precise regulation mandates that the Corps must notify interested parties of a decision to switch from the individual permitting mode to the NWP mode. And, of course, notice and comment ordinarily is unnecessary where the Corps determines that a project may proceed under the authority of NWPs. *See supra,* note 18. The facts of this case (including the events and decisions in *Crutchfield* I, and the discrepancy between

the Corps' internal workings and the information with which it was providing the public), however, are far from ordinary. *See infra.*

58. It is of little consequence that, although the aforementioned principles of administrative law usually are invoked in the context of rule-making, the agency action at issue in this case is more akin to an adjudication. Where, as here, an agency's regulations include notice and comment provisions, those provisions must be presumed to serve the purposes cited above. There is no reason to believe that the

the context of the background of *Crutchfield* I, unthinkable) to tell the Plaintiffs and the interested public one thing (*i.e.,* that the Corps was considering the County's application through the individual permitting process), while, at the same time, internally contemplating (quite seriously) a very different result (*i.e.,* that the project likely could proceed under the NWP program) that would carry significant consequences. In addition, the decision to proceed in that manner effectively precluded, or at least avoided, public comment on certain issues respecting the switch from the individual permit mode to the NWP mode (as well as the Corps' ultimate decision to verify NWPs). The fact that the Corps' decisions respecting NWP verifications are not subject to public notice and comment does not alter that conclusion. Although neither the Court nor the defendants ought to speculate as to the issues and concerns that the Plaintiffs (and others) might have raised, and that the Corps properly would have had reason to consider (if the Corps had been forthright respecting its intentions all along), it is highly likely that, at least, the Plaintiffs would have addressed the propriety of issuing NWPs, given the central focus of that issue in *Crutchfield* I. Thus, even if the invocation of 33 C.F.R. § 330.1(f) were not a classic post-hoc rationalization to justify agency action, that provision would not support the Corps' decision-making process in this case.

### 3. The Corps' Decision That The Project Had "Independent Utility"

The final issue is whether the Corps' decision to allow the County to proceed with its project under the authority of four NWPs was a valid one. For the reasons set forth below, that decision is arbitrary,

capricious, and not otherwise in accordance with law.

The analysis here begins with the precept that a project may proceed under an NWP only if the record demonstrates, and the Corps finds, that the project will have no more than minimal adverse environmental (*i.e.,* wetlands) impacts. *See* 33 C.F.R. § 330.1(b). Where, as here, the project requires multiple NWPs, the cumulative impact on wetlands may not exceed the maximum impact (*i.e.,* number of acres of wetlands affected) allowable under the NWP being used that has the highest allowable limit. *See* 67 Fed.Reg.2020, 2063 (January 15, 2002).

The extent of adverse impacts, of course, depends, in the first instance, on how the project under evaluation is defined. Thus, there is an inextricable linkage between the disclosure of all "reasonably related" activities (*i.e.,* the requirement of section 325.1(d)(2)), and the decision to allow a project to proceed under NWPs. In other words, if all reasonably related activities are not disclosed, the assessment of the project's adverse environmental impacts cannot accurately be determined.

The defendants, however, assert that the Corps' "reasonably related" finding had no continuing import at all because, in their view, the issue simply is whether the project, as described by the County in its November 16 JPA, qualifies for verification under the NWPs that the Corps ultimately approved. If it does, they argue, the Corps' decision must be upheld. *See supra,* at 622 – 623.

Even if that were true, however, a review of whether the project qualifies for the NWPs under which the Corps allowed the County to proceed certainly requires an evaluation of whether the County's JPA satisfied the regulations that, undisput-

Corps' notice and comment regulations are

intended to do otherwise.

ably, *are* applicable to NWPs. Those regulations include a separate test for measuring and defining the scope of the activities under review. The Plaintiffs' argue that the Corps' decision with respect to those regulations also is deficient; and an examination of those regulations, and of the record, reveals that the Plaintiffs are correct.

### a. The Applicable Regulations

During the pre-hearing briefing, the parties devoted unnecessary attention to 33 C.F.R. § 330.6(d), which, everyone later recognized, applies only in the situation where "portions of a larger project . . . proceed under the authority of . . . NWPs while the [Corps] evaluates an individual permit application for other portions of the same project[.]" That was the factual scenario under review in *Crutchfield* I. *Crutchfield*, 154 F.Supp.2d at 895–900. Here, in contrast, the issue is whether the County may proceed under the authority of multiple NWPs. By the time of oral argument, the parties agreed that the Corps did not act pursuant to § 330.6(d). Rather, it relied on 33 C.F.R. § 330.6(c) which provides:

> Multiple use of nationwide permits. Two or more different NWPs can be combined to authorize a "single and complete project" as defined at 33 C.F.R. § 330.2(i). However, the same NWP cannot be used more than once for a single and complete project.

33 C.F.R. § 330.2(i), to which § 330.6(c) refers, explains in relevant part that a "single and complete project" is:

> the total project proposed or accomplished by one owner/developer or partnership or other association of owners/developers. For example, if construction of a residential development affects several different areas of a headwater or isolated water, or sev-

eral different headwaters or isolated waters, the cumulative total of all filled areas should be the basis for deciding whether or not the project will be covered by an NWP.

Additional guidance is set forth at 67 Fed. Reg.2020, 2094 (Jan. 15, 2002), wherein the term "independent utility" is defined as:

> [a] test to determine what constitutes a single and complete project in the Corps regulatory program. A project is considered to have independent utility if it would be constructed absent the construction of other projects in the project area. Portions of a multi-phase project that depend upon other phases of the project do not have independent utility. Phases of a project that would be constructed even if the other phases were not built can be considered as separate single and complete projects with independent utility.

### b. The Corps' Decision

The Corps found that the activities described in the County's November 16 JPA constituted a "single and complete project", and it articulated that finding at three places in its April 4 MFR. A.R., at 6; 23; 38. And, each time that finding is articulated, it accompanies another finding—that is, that the County had included in its JPA all "reasonably related" activities. *Id.* Indeed, those two findings are connected in a very real sense because the Corps relied upon, and recited, the exact same points in support of both of them. It made no distinction between the "reasonably related" test contained in § 325.1(d)(2) and the "single and complete project" test set forth at § 330.6(c). Instead, based on the factors discussed above, *see supra*, Section C.1.B., the Corps concluded that the County "has fully disclosed all of the activities that are reasonably related to the project, and that the

application before the Corps is for a single and complete project with independent utility from the previously proposed [TC Interceptor] as well as from any future improvements to the conveyance of wastewater within the County." A.R., at 6.

Later, at page 23 of the MFR (in the section entitled "Other Options to Handle Sewage in the Future"), the Corps explained those conclusions in slightly more detail. It stated:

The District Engineer has determined that [the] County has fully disclosed all of the activities that are reasonably related to the project presently before the Corps. Based on [the] County's plans to abandon the influent pump station, to eliminate the section of the sewer line shown in the Comprehensive Plan outside of the [SSA] along Totopotomoy Creek, and to voluntarily vacate the easements the County has obtained between Rural Point Road and the [WWTP], if requested, the County has demonstrated to the satisfaction of the [Corps] that [it has] no plans to construct the [TC Interceptor] in the reasonably foreseeable future. Furthermore, the County has identified a number of feasible alternatives for handling sewage within the County in lieu of constructing the [TC Interceptor]. Future pump station construction, treatment plant and pump station upgrades and the currently proposed construction of a sewer line by others

along a portion of the originally proposed [TC Interceptor] alignment would be considered as cumulative impacts of the project that would occur within 7 to 10 years. However, the project that is currently before the Corps has been determined to have independent utility from these other projects and is therefore treated as a single and complete project. The County has clearly demonstrated through its actions that the [TC Interceptor] is neither a necessary adjunct to the [WWTP], nor is it any longer the County's preferred alternative.

Still later, at page 38 of the MFR (in the section entitled "Findings and Decision of the District Engineer"), the Corps states that it "has fully evaluated [the] County's application and has determined that it represents a single and complete project and that the applicant has disclosed all reasonably related activities."

■■■■■ It is worth emphasizing the role of the "independent utility" test, as that test relates to the "single and complete project" requirement of 33 C.F.R. § 330.6(c). In the context of § 330.6(c) and § 330.2(i)—where the issue is whether a project proponent may proceed pursuant to the authority of multiple NWPs—the role of the "independent utility" test is closely akin to the role of the "reasonably related" requirement (provided at 33 C.F.R. § 325.1(d)(2)) under the individual permit regulatory scheme.[59] Both tests

59. This should not be confused with the "independent utility" test provided at 33 C.F.R. § 330.6(d), which, as noted, directly was at issue in *Crutchfield* I. *See Crutchfield*, 154 F.Supp.2d at 895–903. In that case, the issue was whether the WWTP, force main, and outfall had utility that was "independent" of the TC Interceptor, such that the Corps properly could authorize construction on those components while, at the same time, it evaluated the TC Interceptor under the individual permit regulatory scheme. In contrast, the issue

here is whether, taken together, all of the activities that the Corps decided would cause only "minimal impacts" constitute a "single and complete project"—which is to ask, would the County undertake, or "construct," those activities "absent the construction of other projects in the project area?"

Thus, the concept of "independent utility" serves at least two related, but distinct, purposes in the Corps' regulations. Those concepts are related in that both are intended to

serve to define the project under review, which involves properly identifying, and accounting for, all the constituent elements thereof so that the adverse effect on wetlands can be quantified. In the context of individual permits, the regulations accomplish that by requiring an applicant to include within its application "all activities which the applicant plans to undertake which are reasonably related to the same project and for which a [Corps] permit would be required[.]" 33 C.F.R. § 325.1(d)(2). *See supra.* With respect to NWPs, the regulations require essentially the same thing, only they employ a slightly different verbal formulation.

Specifically, before the Corps may verify that a proponent may undertake certain activities under the authority of multiple NWPs, it must confirm that the activities involved constitute a "single and complete project," which means that those activities are "the total project proposed or accom-

plished by one owner/developer or partnership or other association of owners/developers." 33 C.F.R. §§ 330.6(c); 330.2(i). And, as noted, the applicable test for undertaking that inquiry is whether the project "would be constructed absent construction of other projects in the project area." 67 Fed.Reg. at 2094 (stating that "[p]ortions of a multi-phase project that depend upon other phases of the project do not have independent utility[,]" but that, "[p]hases of a project that would be constructed even if other phases were not built" do have "independent utility.").

Thus, the object of the exercise, under either § 325.1(d)(2) or §§ 330.2(i) and 330.6(c), is to assure that the Corps has before it complete information about the full dimension and reach of a project so that it can make an informed decision that the project—*in toto*—will have no more than minimal impact.

identify, and to thwart, instances where project proponents improperly attempt to "segment" their projects to evade fulsome regulatory inspection. *See id.,* at 900, n. 12 (noting that "[s]egmentation and the scope of a project are threads that run throughout NEPA, CWA, and NHPA regulations."). They are distinct, however, with respect to the precise type of segmenting that they aim to prevent. Section 330.6(d) is directed at the type of segmenting that occurs when a project proponent severs a portion of its project that would engender substantial (*i.e.,* more than "minimal") environmental impact (and, therefore, would require an individual permit), and without which the rest of the project simply cannot function as needed or intended. In that type of situation, all of the activities under review are clear and identified; the reviewing agency, or Court, simply must ask "does this, or these, portion(s) of the project (for which the proponent seeks NWP approval) have utility, or value, apart from the value that they have when connected to this other portion of the project (which is under consideration for an individual permit)"? In *Crutchfield* I, the answer to that question, unequivocally, was "no." *See id.,* at 903.

What the Corps seeks to prevent through section 330.6(c), on the other hand, is the type of segmenting that occurs when a project proponent fails to include, as part of its request for NWP verifications, the environmental (*i.e.,* wetlands) impact of "other projects in the project area." That type of segmenting may be more difficult to identify because, almost by nature, the proponent will not have included the segmented activities or components in its project description (or request for NWP verifications). That, of course, is the Plaintiffs' charge in this case.

Thus, it should be clear that both of the foregoing concepts of "independent utility" bear a clear relationship with the other regulatory test aimed at preventing improper segmenting—that is, the "reasonably related" requirement of section 325.1(d)(2). *See Crutchfield,* 154 F.Supp.2d at 895, n. 8 (explaining that, if 33 C.F.R. § 325.1(d)(2) had been applicable in the NWP-context, "the Corps' handling of this matter would have violated the reasonably related requirement for the same reasons that the Corps violated the independent utility requirement of section 330.6(d).").

■ To apply §§ 330.2(i) and 330.6(c), and to assess the project's eligibility for NWPs (including the essential finding that the project will cause only "minimal impacts"), the Corps was obligated to study the record critically and to assess in a fair and reasoned manner what that record did, and did not, reveal. That was especially true here because of the Corps' flawed permitting process, and the decision respecting that process, in *Crutchfield* I.

The Corps was required to assess the County's project in perspective of its substantial cost (more than $30 million) [60] and its stated purpose. That assessment should have included contemplating, in a practical sense, whether the County would expend funds of that magnitude where the result likely would not achieve the County's stated objective.[61] Along those lines, when the County served up an alternative that would allow it to meet its objective for

perhaps only two to six years (absent the construction of additional sewage collection and conveyance lines), the Corps was obligated to examine the record and to obtain defensible answers respecting where, and when, those additional lines might be built.

The Corps was not permitted to confine that inquiry to an unthinking acceptance of the County's responses, especially where, as here, it had every reason to appreciate that the supply of wastewater to the Lee Davis Alternative (and, through it, to the WWTP) would not permit the County to achieve its objectives for more than a very short period of time (in the face of the County's own growth projections). A critical look at the record discloses those serious issues, however, the Corps undertook no thoughtful assessment thereof. The findings in Section II.C.1.b(3) are relevant on that point and, thus, they are incorporated here.

**60.** See *Crutchfield*, 192 F.Supp.2d at 449–50. That estimate of cost is based on the facts adduced at the October 3, 2001 hearing respecting the Plaintiffs' motion for injunctive relief in *Crutchfield* I. Clearly, the precise costs of the project have changed since then. It is beyond serious question, however, that the County's planned wastewater treatment improvements project will require the expenditure of many millions of dollars in County funds. Indeed, the WWTP portion of that project, alone, was estimated to cost between $18 and 19 million.

**61.** Indeed, the record reflects that the Corps is quite cognizant of the need to evaluate projects pragmatically, and in light of their proponents' proffered goals. In particular, the record contains a November 26, 2001 internal Corps e-mail (which is addressed to Ms. Painter, and to others) in which one of its high-ranking officials considers "whether pumping it to another county should be considered[.]" A.R., at 2834. Although it is not entirely clear, it is not unreasonably speculative to presume that the "it" referred to above is wastewater, and that the topic of concern in that e-mail is the degree to which the

environmental laws and regulations that the County's JPA, and the Plaintiffs' objections thereto, implicated, required the Corps to consider alternatives to the project as a whole. The remainder of the November 26 e-mail bears out that presumption.

It was concerning that issue, then, that the Corps' representative proffered "[o]ne of [his] all-time favorite quotes from Regulatory case law[,]" which was as follows:
> Under these [404(b)(1)] Guidelines, therefore, not only is it permissible for the Corps to consider the applicant's objective; the Corps has a duty to take into account the objectives of the applicant's project. Indeed, it would be bizarre if the Corps were to ignore the purpose for which the applicant seeks a permit and to substitute a purpose it deems more suitable.

*Louisiana Wildlife Federation v. York*, 761 F.2d 1044, 1048 (5th Cir.1985).

After quoting that passage, the representative explained that "[i]f the County's purpose is to address its sewage needs within its boundaries ... then pumping it outside the County would not be a practicable alternative because it wouldn't address the applicant's overall purpose." A.R., at 2834.

At the same time, the record reveals that other sources of sewage are being planned and that, since *Crutchfield* I, one of those activities has been accelerated by 10 years. That activity, now apparently slated for 2007, is a pump station that will be of no use unless it connects to a sewage conduit. The County's own planning map indicates that one of the nearest conduits presently defined in the County's plans is the LC Sewer, which traverses quite near to a water of the United States, thereby portending substantial wetlands impacts. The Corps was obligated to know those things, all of which are in the record, and to critically assess their significance. It did not.[62] Instead, it once again accepted the County's representations without pressing for answers to the obvious questions that an expert agency should have asked.

In like fashion, the Corps fully was aware that the County and The Hanover Group had struck an agreement pursuant to which, if the County did not build the TC Interceptor, The Hanover Group would build a sewer in the alignment of that interceptor and for the purpose of serving of its "Bell Creek" development. The Corps also knew that, after the decision in *Crutchfield* I, and after the County filed its November 16 JPA, The Hanover Group filed its own application for an individual permit for the "Bell Creek" sewer. A.R.

1659–61. The Corps knew that the "Bell Creek" sewer would be in the right-of-way owned by the County; that the County was paying for part of the construction cost thereof through an oversize credit; and that, when built, the sewer would be a public sewer owned by the County.

Notwithstanding those compelling indicia that the County and The Hanover Group might very well be an "association of owners/developers" (within the meaning of § 330.2(i)), the Corps neither discussed, nor made any finding respecting, the likelihood (or even the possibility) that the impacts of the "Bell Creek" sewer should have been included in the County's application. That assessment is of great significance here because, as noted above, The Hanover Group was not even going to build the "Bell Creek" sewer if, as the County had planned, the TC Interceptor was built. That fact, considered in perspective of the facts that the "Bell Creek" sewer would be built on County property, through partial funding by the County, and that the County ultimately would own it, cries out for serious assessment. That is especially true because the Corps knew that, if the "Bell Creek" sewer had been included in the County's November 16 JPA, there could have been no finding that the County's project had only "minimal impacts."[63] Instead of facing that issue,

---

**62.** For example, after recognizing that the Powhite Creek Forcemain and Pump Station may "come on line around 2007," the Corps explained that "[t]he exact location of [those components] have not been identified, therefore, the extent to which the project would be within the Corps' jurisdiction cannot be determined at this time." A.R., at 23. Similarly, the Corps noted that "[s]ome of the future activities in the vicinity of this project are likely to result in wetland impacts, although the specific acreages of impact cannot presently be defined." A.R., at 24 (anticipating that "avoidance, minimization, and mitigation" would render cumulative impacts of

such activities "minimal"). Further still, in the "Findings and Decision" section of the April 4 MFR, the Corps notes that "[f]uture treatment and conveyance projects that will be developed by the County when the need arises must be reviewed for compliance with applicable State and federal laws and approved or denied as appropriate." A.R., at 38.

**63.** The January 15, 2002 public notice that the Corps issued with respect to The Hanover Group's sewer project reflects that construction of that project will engender substantial wetlands impact. A.R., at 1644–46. It is

however, the Corps made the conclusory finding that "the proposed work by others along a portion of the original [TC Interceptor] alignment is not reasonably related to Hanover County's Project and will be evaluated by the Corps as part of [T]he Hanover Group's application for multi-use development." A.R., at 38.

The April 4 MFR makes clear that the Corps based its decision that the County had submitted an application for a "single and complete project" on the same conclusions upon which it based its "reasonably related" finding. But, as explained above, those conclusions provide no support for that finding. And, for the same reasons, the "single and complete project" finding equally lacks in record support. How, for example, can the four components of the project contained in the November 16 JPA be considered the County's "total project" in perspective of the fact that, in that form, with no other improvements, the County would exceed its limit under its contact with Henrico by 2004? How can a project have "utility" that genuinely is "independent" of "other projects in the project area," such as the "Bell Creek" sewer, the Powhite Creek Pump Station, and the LC Sewer, when the evidence reflects that those projects are either presently being, or planned to be built, for the very same purpose as the project under review (that is, for the purpose of off-loading sewage from Henrico to the WWTP)? The Corps' decisional document simply does not address, much less satisfactorily answer, those questions for the same reasons that its "reasonably related" finding is deficient. That document reads as if the Corps officials simply met with the Coun-

ty's representatives, asked some questions, wrote down what they heard, and copied the County's answers into the April 4 MFR.

The County emphasizes that the project for which it sought authorization does have "independent utility" because it "serves two distinct needs of the County—additional treatment capacity and a conveyance system for bringing untreated wastewater to the plant." June 17, 2002, The County of Hanover's Pre–Hearing Memorandum and Response to Plaintiffs' Pre–Hearing Memorandum, at 19, 23; *see also* A.R., at 429.

The record supports the County's assertion that construction of its wastewater treatment project (as that project is described in its application) would serve two of its needs. In its pre-hearing brief, the County cited to page 451 of the administrative record, and at that hearing it also noted page 460 of the record, as evidence of that fact. Both of those citations are to the County's Wastewater Alternatives Study, which previously has been discussed, and which the County submitted to the Corps in support of its November 16 JPA.[64] Page 460 of the record states:

> The project will allow [the] County to divert approximately 700,000 gpd of wastewater from Henrico to the [WWTP] for initial start-up. This amount of flow will allow the County to provide necessary wastewater services for the health, safety, and welfare of its citizens, support its "smart growth" policy, economically operate the new plant, and insure that it remains in compliance with its contract with Henrico County. The proposed Lee Davis [Alternative]

undisputed that, if those impacts were added to those described in the County's November 16 JPA, they would render the County's project unfit for the use of NWPs.

[64]. It is worth noting that those two citations are the only ones to which the County has pointed in support of its "twin aims" argument. Both citations are to the same County-generated and County-proffered document.

... is an environmentally sensitive, economically affordable first conveyance project to the [WWTP]. There will be future conveyance projects that will also connect to the [WWTP] that will be developed as needed and will be required to stand on their own merits.

The April 4 MFR, however, does not reflect that the Corps relied upon the foregoing rationale in making its determination that the activities for which the County had sought approval constituted a "single and complete project" that "would be constructed absent construction of other projects in the project area." To the contrary, the "twin aims" rationale that is set forth in the County's brief, and that is supported by the County's Wastewater Alternatives Study, simply does not appear in the Corps' decisional document at all.

Instead, and as noted earlier, when the Corps articulated its decision that the County's application describes "a single and complete project," it appears to have relied on the very same factors upon which it relied to support its determination that the County's JPA included all "reasonably related" activities. A.R., at 5–6; 23; 38. However, as stated above, the manner in which the Corps examined, and arrived at the conclusions underlying, those factors provides no more support for the "reasonably related" finding than for the finding of "independent utility."

Even if the Corps did rely on the justification that the County has proffered—that the project, as applied for, is a "single and complete" project with "utility" independent from other projects in the project area because (1) it provides an initial means through which to convey sewage to the WWTP; and (2) it will provide allow the County economically to begin operating the WWTP, the Corps' decision would be no more defensible. That is because, in view of the County's own representations

(as well as the Plaintiffs' showings), those two ends do not realistically reflect, or take into account, the purposes for which the County is undertaking its project.

In sum, the Corps' finding that the November 16 JPA described a "single and complete project" is defective. The Corps merely recited the same considerations that animated its deficient finding as to the "reasonably related" requirement of 33 C.F.R. § 325.1(d)(2) and, along side of its declaration that the County's application was "complete," declared that its application also described "a single and complete project" within the meaning of 33 §§ 330.6(c) and 330.2(i). One will search in vain for any reference to issues such as "would the project, as proposed, be constructed absent construction of other projects in the project area," such as the ones discussed above? Similarly, there is no discussion in the April 4 MFR of whether the County's JPA describes plans to construct only "portions" of a project that, in reality, "depend on other phases" to achieve actual utility. Finally, the Corps appears to have turned a blind eye to what is, in the final analysis, a central question that the Plaintiffs' case raises—that is, how could any reasonably prudent public official justify the expenditure of tens of millions of dollars to plan, build, maintain, and litigate over, a wastewater treatment improvements project that, as described (and absent additional improvements) might serve its needs for perhaps two to three years, and, at most, six years. The Corps should have broached those topics. Its failure to do so, as well as the patently conclusory manner in which it arrived at its final determination, render the Corps' decision as to 33 C.F.R. § 330.6(c) arbitrary and capricious. And, for the reasons set forth above, that renders invalid its subsequent determination that the impacts of the County's project are only "minimal."

## CONCLUSION

 The decision on the merits in *Crutchfield* I reflected that, in that case, the Corps' permitting decision was full of unexplained, and inexplicable, holes. After having struggled for some time with the Corps' analysis of the issues presented there, and after attempting to trace a reasoned path through that analysis, it was evident that the permitting decision could not stand. That judgment was inescapable, and, in large part, it was based on the following precepts:

It is axiomatic that the Corps is obligated to provide reasoning to support its determination[s]. . . . That is especially important where, as here, the determination is, on its face, of doubtful rationality. Of course, the Court is obligated to uphold " 'a decision of less than ideal clarity if the agency's path may reasonably be discerned,' " *State Farm Mut. Auto. Ins. Co.*, 463 U.S. at 43, 103 S.Ct. 2856, 77 L.Ed.2d 443, but that precept does not apply here because the Corps' decisional path is not discernable. . . . The articulation of the Corps' reasoning is of utmost importance particularly in the process followed by the Corps which encourages private resolution of the details respecting matters of public importance. . . . [T]he regulated party and the regulator are not the only interested parties in respect of these decisions. Thus, if what is said behind closed doors is convincing to the regulator, it is obliged to set forth clearly and cogently its reasoning when it makes its decision public. Nowhere is that more important than where, as here, the logic of the decision is so difficult to discern and where the decision is such a drastic departure from long-standing plans and from reality. Under these circumstances, the agency must articulate why it has made its decision with sufficient clarity that others affected by the deci-

sion and the Courts can understand it. The Corps has not done that and its determination . . . cannot stand[.]

*Crutchfield*, 154 F.Supp.2d at 899–900. The matter was remanded, and the Corps was afforded the opportunity to reconsider the County's plans and to ameliorate the analytical problems and deficiencies that so badly had undermined its decision. It was understood, and fully expected, that the Corps would take a hard look at the matter and make a fresh start. *See Crutchfield*, 175 F.Supp.2d at 846 (presuming that Corps will "endeavor to abide by the law[ ]" and "attempt to keep the previous flawed decision from affecting the calculus of the permitting decision on remand.").

It is uniquely disquieting, therefore, to be confronted with the present decisional document, which reflects that the Corps, again, essentially abdicated its statutory and regulatory obligations. The defendants, no doubt, will emphasize the voluminous administrative record that the parties proffered, as well as the forty-seven page document in which the Corps articulated the reasoning underlying its decision. And, there is no question that the Corps considered many topics in reaching, and used many words to justify, its decisions. However, after studying that decisional document in perspective of the facts of record, including the events and judgments in *Crutchfield* I, and having considered the parties' arguments, what stands out are those topics that the Corps failed to consider. The absence of thoughtful explication respecting those topics thoroughly has frustrated the Court's concerted effort to "reasonably discern the agency's path."

As an initial matter, of course, the Corps failed realistically to examine how much wastewater the Lee Davis Alternative will

off-load from Henrico to the WWTP. The conclusion that the amount off-loaded would be "comparable" to the amount that the TC Interceptor would have off-loaded, which is interspersed throughout the April 4 MFR, is correct as far as it goes. However, that is not an answer to the questions that, logically, should have prompted activation and application of the Corps' expertise (after reviewing the Plaintiffs' concerns). As the Plaintiffs properly have recognized, the capacity of the Lee Davis Alternative is not particularly relevant. What is important, and what the Corps was obligated to consider, is the amount of flow that will be necessary to assuage the County's avowed sewage treatment crisis and from where, and through what means, that sewage would be conveyed. Moreover, the Corps breezed over compelling evidence that suggests that several activities within the SSA—The Hanover Groups's "Bell Creek" sewer, the Powhite Creek Pump Station, and the LC Sewer—should have been included in the County's November 16 JPA. As discussed, that is true under both relevant tests for defining the scope of a given project (*i.e.*, the "reasonably related" test set forth at 33 C.F.R. § 325.1(d)(2) and the "single and complete project" test provided for in 33 C.F.R. § 330.6(c)).

What the record reflects is that, almost from the start, the Corps seriously was considering authorizing the County to proceed pursuant to NWPs. As discussed, that was contrary to the representations that the Corps made to this Court and to the public. Thereafter, the Corps set off to reason to its intended result. It met with the County's representatives and asked questions, however, it blindly accepted the County's responses and did not independently assess whether those responses, or the conclusions to which they led, made logical and practical sense. The Corps recited the County's responses, almost verbatim, into its intermediate MFRs and, ultimately, into its final decisional document. That manner of decision-making, by a federal regulatory agency, is woefully inadequate.

Finally, it is worth reiterating that the events of *Crutchfield* I, as well as the nature and outcome of the Corps' review of the County's November 16 JPA, have forced the Court to conduct its judicial review in a rather unique context. If ever a case required the Court to employ a standard of review that is less deferential than that which ordinarily is employed, this is that case. That said, however, it must be emphasized that, even absent *Crutchfield* I, and even under a so-called "ordinary" standard of review, this case would be decided exactly the same way. Such is the extent of the Corps' shortcomings in this case.

Accordingly, the Corps' findings as to 33 C.F.R. §§ 325.1(d)(2) and 330.6(c), as set forth in the April 4 MFR, are set aside as arbitrary, capricious, and not in accordance with law. For that reason, the Corps' verification that the County may proceed with the construction of its wastewater treatment project pursuant to the authority of NWPs 7, 12, 18 and 39 is arbitrary, capricious, and not otherwise in accordance with law, and that decision is VACATED. The matter, again, will be remanded to the Corps for review and for a decision not inconsistent with this Memorandum Opinion. Unfortunately, however, the unique facts of this case require the issuance of more specific instructions on remand, which are set forth in the accompanying Order.

The Clerk is directed to send a copy of this Memorandum Opinion to all counsel of record.

It is so ORDERED.

**ORDER**

For the reasons set forth in the accompanying Memorandum Opinion it is hereby ORDERED that: (1) the decision of the United States Army Corps of Engineers (the "Corps"), as reflected in its Memorandum For the Record dated April 4, 2002, verifying that the County of Hanover, Virginia (the "County") may use Nationwide Permits No. 7, 12, 18, and 39, is VACATED and set aside as arbitrary, capricious, and not otherwise in accordance with law; and (2) that the matter is remanded to the Corps for further proceedings not inconsistent with the Memorandum Opinion and the ensuing provisions of this Order.

For reasons adequately set forth in the accompanying Memorandum Opinion, it is further ORDERED that:

(1) the Corps shall consider the Joint Permit Application filed by the County on November 16, 2001 as an application for an individual permit;

(2) the Corps shall issue a new Notice of proceedings under 33 C.F.R. § 325.3, which may be in form and content as prepared by the Corps, however, the Notice: (a) shall explicitly call for comment on the possibility that the Corps may consider the application as eligible for verification under the Nationwide Permit Program; (b) shall specify explicitly which Nationwide Permits the Corps has in mind; and (c) shall explicitly solicit the comments of interested parties on that topic, as well as on the findings that must be made pursuant to 33 C.F.R. § 325.1(d)(2) and 33 C.F.R. § 330.2(i); and

(3) in considering the decisions that must be made under 33 C.F.R. § 325.1(d)(2) or, under 33 C.F.R. § 330.2(i), the Corps shall specifically assess each of the points and issues on which the April 4, 2002 Memorandum For the Record has been found deficient in the relevant sections of the accompanying Memorandum Opinion, and, in its final decision document shall make specific written findings in respect of each such issue in a way that will permit meaningful judicial review of those findings and the reasoning underlying them; and

(4) the issuance of public notice, and the administrative procedures on remand, shall be accomplished by a district office of the Corps different than the district office which heretofore has been involved in considering the County's applications respecting the instant project; and

(5) the Corps shall report to the Court within fourteen (14) days respecting the most expedited schedule on which such tasks, on remand, can be accomplished.

The Clerk is directed to send a copy of this Order to all counsel of record.

It is so ORDERED.